IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | MO-10-CR-271 |
| | ) | |
| | ) | |
| VS. | ) | Suppression Hearing |
| | ) | |
| | ) | |
| MICHAEL ANGELO CAVAZOS | ) | January 14, 2011 |

BEFORE THE HONORABLE ROBERT JUNELL
UNITED STATES DISTRICT JUDGE
In Midland, Texas

FOR THE GOVERNMENT:        MR. AUSTIN BERRY
                          Assistant United States Attorney
                          400 W. Illinois, Suite 1200
                          Midland, Texas  79701
                          (432) 686-4110

FOR THE DEFENDANT:        MR. DUSTY GALLIVAN
                          Gallivan & Associates
                          323 N. Grant
                          Odessa, Texas  79761
                          (432) 550-3870

COURT REPORTER:           MR. TODD ANDERSON, RMR, CRR
                          United States Court Reporter
                          200 E. Wall, Rm. 116
                          Midland, Texas  79701
                          (432) 686-0605

    The above-styled and numbered cause was reported by

mechanical stenography and produced by computer.

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESSES FOR THE DEFENDANT** | | | | | |
| MICHAEL CAVAZOS | 5 | 19 | 27 | | |
| LeANDREW MITCHELL | 29 | 37 | | | |

Defendant rests........................................ 43

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESS FOR THE GOVERNMENT** | | | | | |
| ERIC TARANGO | 44 | 51 | | | |

Government rests....................................... 53

Defendant closes...................................... 53

ARGUMENT:  Mr. Gallivan............................... 53,58

ARGUMENT:  Mr. Berry.................................. 55,59

1          (January 14, 2011)

2          (Defendant present)

3          THE COURT:  All right.  Let's call the case.

4          THE CLERK:  The Court calls MO-10-CR-271, the United

5    States of America versus Michael Angelo Cavazos.

6          MR. BERRY:  Austin Berry for the United States.

7          MR. GALLIVAN:  Dusty Gallivan on behalf of the

8    Defendant, Your Honor.  We're present and ready.

9          THE COURT:  Mr. Cavazos, would you stand up for just

10   a second, please, sir?

11         Would you state your name for me?

12         THE DEFENDANT:  Michael Angelo Cavazos.

13         THE COURT:  And you understand we're here today on a

14   motion filed by your attorney to suppress certain statements

15   you made at the -- when the officers came to your home.  Do you

16   understand?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  And it's my understanding that,

19   Mr. Gallivan, you are not suppressing the search at all?

20         MR. GALLIVAN:  No, sir.  Just the statements.

21         THE COURT:  And, Mr. Berry -- or, Mr. Gallivan, would

22   you recount for us the statements that you are trying to

23   suppress?

24         MR. GALLIVAN:  The --

25         THE COURT:  Mr. Cavazos, you can be seated for just

1    a second.

2            MR. GALLIVAN:  Specifically, the written statement

3    that he made, Your Honor, and any oral statements that

4    corroborate that written statement.

5            THE COURT:  And these are the statements that he

6    talked about -- that he admitted that he had been sexting the

7    minor girl --

8            MR. GALLIVAN:  Yes, sir.

9            THE COURT:  -- and had been sexting her on his phone?

10           MR. GALLIVAN:  Yes, sir.

11           THE COURT:  Those are those statements?

12           MR. GALLIVAN:  Yes, sir.

13           THE COURT:  Okay.  And were there other statements

14   besides the sexting that's at controversy here?  I was just

15   wondering.

16           MR. GALLIVAN:  I don't believe so, Your Honor.

17           MR. BERRY:  Your Honor, there was a report that

18   Mr. Gallivan has been provided that gives a synopsis of the

19   interview, the full interview.  The written statement is

20   actually quite minimal.  It was done after the oral statements,

21   and then he was stopped as he started writing that written

22   statement.  He was Mirandized, and that's when he invoked.

23           So what's really at issue here are the oral

24   statements that he gave to Officer Mitchell -- Agents Mitchell

25   and Tarango.  And those statements include, obviously, the

1    sexting, his relationship with the juvenile, as well as his

2    statements about relationships with other juveniles.

3            And in particular we would also want to be using, if

4    it were to come in under a 404(b) analysis, his admissions

5    regarding his sexual relations with a 12-year-old girl when he

6    was 18 years old that we think would be relevant at least on a

7    404(b) issue.

8            THE COURT:  Okay.  All right.  So, Mr. Gallivan, I

9    would be glad to hear from you.  What do you want to put on?

10           MR. GALLIVAN:  Call Mr. Cavazos, Your Honor.

11           THE COURT:  Okay.  Mr. Cavazos, come take the stand.

12           (Pause)

13           THE CLERK:  Would you raise your right hand, please?

14           (The Defendant was sworn)

15           THE CLERK:  Have a seat.

16           THE COURT:  All right.  You may proceed.

17           MICHAEL ANGELO CAVAZOS, DEFENDANT, SWORN

18                      DIRECT EXAMINATION

19   BY MR. GALLIVAN:

20   Q.   Please state your name for the record.

21   A.   Michael Angelo Cavazos.

22   Q.   And, Mr. Cavazos, you understand why we're here today; is

23   that correct?

24   A.   Yes, sir.

25   Q.   Specifically, I want to talk about the incident, I

1  believe, on September 1st of this year [sic].

2  A.    Okay.

3  Q.    Do you recall that?

4  A.    Yes, sir.

5  Q.    Do you recall -- just a brief summary.  Do you recall the

6  police officers coming to your house?

7  A.    No, I didn't.

8  Q.    You don't recall them coming?

9  A.    Oh, oh.  Yes, yes, yes.

10  Q.    Do you recall what time of day that was?

11  A.    It was about 5:30, 6:00 in the morning.

12  Q.    Were you awake or asleep?

13  A.    I was asleep.

14  Q.    How were you awakened?

15  A.    Banging at the door and flashlights and all that.

16  Q.    Did you get up to answer the door?

17  A.    No.  My wife did.

18  Q.    And once the door was opened, do you know what happened?

19  A.    They came running in and ID'd me and put me in handcuffs

20  in my room.

21  Q.    When you say they ID'd you, what was that?

22  A.    Well, I heard one of the female officers say, "Well,

23  that's him right there."  And then they went to me and put me

24  in handcuffs.

25  Q.    Somebody identified who you were?

1    A.    Yes.

2    Q.    Put you in handcuffs at that point?

3    A.    Yes.

4    Q.    Where were you at that point?

5    A.    When they put me in handcuffs?

6    Q.    Yes, sir.

7    A.    I was in my room.

8    Q.    In your bedroom?

9    A.    Yes.

10   Q.    Were you in bed, just getting out of bed?

11   A.    All I had was my underwear on.

12   Q.    So you were just getting out of bed?

13   A.    Yes, just getting out of bed.

14   Q.    After you were handcuffed, where did they take you?

15   A.    They took me to the kitchen.  I mean to the dining room.

16   I'm sorry.  Dining room.

17   Q.    Of your house?

18   A.    Yes, sir.

19   Q.    At that point where were the other members of the

20   household?

21   A.    They were being awakened by the agents and stuff and

22   brought into the living room.

23   Q.    If I understand the scene correctly, you're sitting in the

24   dining room or at the kitchen table --

25   A.    Yes.

1   Q.    -- in handcuffs while they were checking out the rest of

2  the house?

3   A.    Yes, sir.

4   Q.    Are you still in your boxer shorts?

5   A.    They -- before they pulled me out of the room, they let me

6  put a pair of wind pants on, but I didn't have a shirt.

7   Q.    How many other people were in the house?

8   A.    Like family members or agents?

9   Q.    Just family members.

10   A.    Family members, it was me, my wife, and my three kids.

11   Q.    So four other people and you?

12   A.    Yes.

13   Q.    The four other people, were they located and brought into

14  the living room?

15   A.    Yes, they were.

16   Q.    At this point what happened?

17   A.    They were brought into the living room.  I was sitting in

18  the dining room.  They brought me a shirt.  From that point --

19   Q.    Who's "they"?

20   A.    One of the agents brought me a shirt.

21   Q.    Okay.  Go ahead.

22   A.    And they ended up taking the handcuffs off me, and then

23  they took me to my -- to my back -- to my back bedroom, where

24  my son -- my son's room.

25   Q.    Okay.  When you said they took you to the back bedroom,

1    did they say anything to you?

2    A.    No.   They just took me to the back bedroom.

3    Q.    They just, what, picked you up and took you --

4    A.    Yes.

5    Q.    -- or how did it happen?

6    A.    Well, they just unhandcuffed me and walked me back to the

7    room and --

8    Q.    Did they say anything to you?

9    A.    When I got into the room?

10   Q.    No.   When they took you from the living room to the

11   bedroom, did they say anything to you?

12   A.    No.

13   Q.    Did they grab you by the arm?  Did they say, "Come with

14   us"?  What happened?

15   A.    Yeah.   You know, "Follow me.   Let's go to the back

16   bedroom."   Picked me up and unhandcuffed me and led me to the

17   back bedroom.

18   Q.    At this point, prior to getting into the bedroom, did they

19   say, "We want to talk to you" or anything like that?

20   A.    Once we got into the back bedroom, they did.

21   Q.    So between the kitchen area and the bedroom, they didn't

22   say anything?

23   A.    No.

24   Q.    Okay.   Then they take you into the bedroom?

25   A.    Uh-huh.

1   Q.   Where do you sit?

2   A.   Where was I sitting in the bedroom?

3   Q.   Yes.

4   A.   I was sitting on the bed.

5   Q.   And where were the agents?

6   A.   Directly in front of me in two chairs.

7   Q.   Two chairs.  Where did the chairs come from?

8   A.   I had a -- my son had a little fold-out chair, and I think

9   they got a chair from the kitchen.

10  Q.   So it's you and two agents in the bedroom?

11  A.   Yes.

12  Q.   Is the bedroom open or closed?

13  A.   It was closed.

14  Q.   At this point, without telling us anything else, did you

15  feel that you were free to leave?

16  A.   No.

17  Q.   After you're sitting on the bed, the agents are sitting in

18  the chairs, who speaks first?

19  A.   They do.

20  Q.   And do you recall what they said?

21  A.   They asked me if I knew why they were here.

22  Q.   And what was your response?

23  A.   I said yes.

24  Q.   Did you really know why they were there?

25  A.   Yeah.  Yeah.

1  Q.   Did they start asking you questions at that point?

2  A.   No.  After they -- well, after they asked me if I knew why

3  they were there, that's when I had said, "Well, I need to -- I

4  think I need to call my lawyer."

5         And that's when they said, "Well, why do you need

6  that?  We're just asking you questions."

7  Q.   Hang on a second.  They said, "You know why we're here."

8  You said, "Yes."  And then you said what?

9  A.   "I think I need to call my lawyer."

10  Q.   And what was their response?

11  A.   "Why do you need to do that?"

12  Q.   And what was your response?

13  A.   I was like, "Well, that's what I just need to do."

14  Q.   Now, you ultimately answered some of their questions?

15  A.   Yes.

16  Q.   Why did you get off the request for the lawyer then?

17  A.   I don't -- I don't know.  I was just, I guess, shocked.  I

18  mean, I was scared.  I was -- I had all these agents, like

19  14 -- I don't know how many.  There were a lot of them that

20  showed up at my house.  I've never -- that has never happened

21  to me, and I was just scared.

22  Q.   Now, after you made this request for a lawyer and they

23  asked why, then what happened?

24  A.   I believe I talked to them for a little bit or -- I ended

25  up going to the rest room.  I asked them to go to the rest

1    room.  They went in there and checked it first.  Well, they

2    followed me to the rest room, and they stood outside the door.

3    Q.    Hang on a second.  Between when you requested the attorney

4    and when you said you had to go to the rest room, what happened

5    during that period of time?  Were there any questions asked by

6    them?

7    A.    Yeah, I think so.

8    Q.    You just don't remember the specifics?

9    A.    Yeah, I just don't remember the specifics.

10   Q.    And did you tell the officers, "Look, I need to go to the

11   bathroom," or "Can I go to the bathroom?"  What did you say?

12   A.    Yeah, "I need to go to the bathroom."

13   Q.    And what was their response?

14   A.    "Yes, but we need to go in and check it first."

15   Q.    Did you feel free to just get up and go to the bathroom in

16   your own house at that point?

17   A.    No.

18   Q.    You mentioned that the officers then went and checked the

19   bathroom to make sure it was safe?

20   A.    Yes.

21   Q.    That there were no weapons hiding, that kind of thing?

22   A.    No weapons hiding.

23   Q.    Did you then go into the rest room?

24   A.    Yes, but I had to leave the door cracked open.

25   Q.    Did they follow you into the bathroom or just stand

1    outside?

2    A.    They stood outside.

3    Q.    At that point, when you were in the rest room, did you

4    feel like you were free to leave?

5    A.    No.

6    Q.    When you were finished with the rest room, what happened?

7    A.    I ended up going into the kitchen, which they went with

8    me, and I washed my hands while they were there with me when I

9    was washing my hands.

10   Q.    Did they follow you into the kitchen?

11   A.    Yes.

12   Q.    When you were in the kitchen, did you feel like you were

13   free to leave?

14   A.    No.

15   Q.    After you washed your hands, what happened?

16   A.    That's whenever I went back into the room.

17   Q.    Into the bedroom?

18   A.    Yes, back into the bedroom.

19   Q.    This is your son's bedroom?

20   A.    My son's, yes.

21   Q.    So you go back into the bedroom.  Do you sit on the bed?

22   A.    Yes.

23   Q.    The agents sit in the chairs?

24   A.    Yes.

25   Q.    Was the bedroom door open or closed?

1   A.   It was closed.

2   Q.   At this point did you feel free to leave?

3   A.   No.

4   Q.   Did the questioning resume at that point?

5   A.   Yes.

6   Q.   Do you recall any of the specifics of the questions?

7   A.   They just asked me about my relationship with the girl and

8   like if -- just basically that type of stuff.

9   Q.   Real quick, go back to when you first got into the bedroom

10  and before you went to the bathroom.   How much time elapsed?

11  Do you recall?

12  A.   It wasn't very much time.   I don't --

13  Q.   Like five minutes?

14  A.   Yeah, probably.

15  Q.   Okay.   The second time when you go into the bedroom,

16  between that point and when you leave the bedroom again, how

17  much time lapsed?

18  A.   An hour or two.

19  Q.   Were you wearing a watch?

20  A.   No.

21  Q.   Are there any clocks in your son's room that you could

22  see?

23  A.   No.

24  Q.   Now, you're back in the bedroom after you've washed your

25  hands, and the questioning resumes, correct?

1   A.   Yes.

2   Q.   At some point they asked you to put your statements in

3   writing; is that correct?

4   A.   That's correct.

5   Q.   Is this after the hour or so?

6   A.   Yes.   This is -- this is after -- after a while.

7   Q.   I'm sorry?

8   A.   This had been after a while.

9   Q.   During that hour or two that you're in the bedroom and

10  they're asking you these questions, did you ever feel like you

11  were free to just get up and walk out the door?

12  A.   No.

13  Q.   If you were to do that, what did you expect would happen

14  to you?

15  A.   Probably put me in handcuffs again or say, "Hey, what are

16  you doing?" you know.   Probably something like that.

17  Q.   They asked you then to go write the statement, correct?

18  A.   Yes.

19  Q.   And then you went where?

20  A.   Into the kitchen.

21  Q.   And did you have the paper, or did they provide you paper?

22  How did that work?

23  A.   They gave me the paper.

24  Q.   Excuse me?

25  A.   They gave me the paper.

1    Q.    And you began to write out a statement?

2    A.    Yes.

3    Q.    How long were you writing that statement before they

4    stopped you?

5    A.    Oh, it was not even less than -- longer than five minutes,

6    maybe.

7    Q.    And when they stopped you, did they say anything to you at

8    that point?

9    A.    When they stopped me, they came in and said I was under

10   arrest.

11   Q.    You said they came in.  Where were they when you were

12   writing?

13   A.    They left -- they left.

14   Q.    The house?

15   A.    No.  They left, like, they weren't -- there was a guy

16   standing in the doorway, kind of just keeping an eye on me.

17   And then the two agents that I talked to were -- they left.

18            And then they came back, and that's when they told me

19   that I was under arrest, and they said, "Stop writing."

20   Q.    Make sure I understand this correctly.  You're -- they

21   want you to write a statement, so you go to the kitchen table?

22   A.    Uh-huh.

23   Q.    Is that yes?

24   A.    Yes.

25   Q.    They give you a piece of paper?

1   A.   Yes.

2   Q.   And you start to write.  And the two agents who were

3   questioning you leave?

4   A.   Yes.

5   Q.   Another agent is standing nearby, keeping an eye on you?

6   A.   Yes.

7   Q.   At that point did you feel like you were free to get up

8   and leave?

9   A.   No.

10  Q.   You were writing for five minutes or less, and the other

11  two agents come back in and tell you to stop?

12  A.   Yes.

13  Q.   What else did they tell you?

14  A.   That's when they told me I was under arrest, and they --

15  that's when they read me my Miranda rights.

16  Q.   Prior to this moment, had they read you your Miranda

17  rights at any point?

18  A.   No.

19  Q.   When you were sitting in the kitchen initially in

20  handcuffs and they were going to take you to the bedroom, did

21  they read you your rights?

22  A.   No.

23  Q.   Did they explain to you that you had the right not to talk

24  to them?

25  A.   No.

1    Q.    Did they explain to you you had the right to have an

2    attorney present --

3    A.    No.

4    Q.    -- during any questioning?

5          In the Government's response there is a statement

6    that you made -- you even made a phone call while this was

7    going on?

8    A.    Yes.  I had called my brother to tell him I was going to

9    be late for work.

10   Q.    When did this take place?  During the period when you

11   first went in there till the bathroom or after you came back

12   from the bathroom till the end?

13   A.    This was after I came back from the bathroom.

14   Q.    And when you made that phone call, where were you?

15   A.    I was in the bedroom.

16   Q.    And whose phone did you use?

17   A.    They allowed me to use my work phone.

18   Q.    And where was that phone at the time?

19   A.    It was being searched or -- they had it.

20   Q.    Did they have to bring it to you to use it?

21   A.    Yes, they had to bring it to me.

22   Q.    Did -- they didn't let you get your own phone?

23   A.    No.

24   Q.    Did you feel free to leave to go outside to have some

25   privacy to talk to your brother?

1    A.    No.  They had me hold the phone so they could hear me
2    talking to him.
3    Q.    So you weren't even allowed to have a private
4    conversation?
5    A.    No.
6    Q.    Did you make any other phone calls at this time?
7    A.    No, I didn't.
8    Q.    Thank you, sir.
9              MR. GALLIVAN:  Pass the witness, Your Honor.
10             THE COURT:  Mr. Berry.
11             MR. BERRY:  Thank you, Your Honor.
12                       CROSS-EXAMINATION
13   BY MR. BERRY:
14   Q.    Good morning, Mr. Cavazos.  My name is Austin Berry.  I'm
15   a prosecutor on your case.  I want to ask you some more
16   questions along the same lines as what your attorney,
17   Mr. Gallivan, just asked you about the events of September 1st.
18             You acknowledge, do you not, that when you were --
19   when the agents first came in, you were handcuffed, correct?
20   A.    Yes.
21   Q.    And then shortly thereafter they took the handcuffs off of
22   you; is that correct?
23   A.    That's correct.
24   Q.    And they asked you if there was a place that you and the
25   two agents could speak privately; is that correct?

1    A.    Yes.

2    Q.    And you suggested one of the bedrooms; isn't that correct?

3    A.    The back bedroom.

4    Q.    Is that correct?

5    A.    That's correct.

6    Q.    So you and the two agents went back to the back bedroom,

7    correct?

8    A.    Correct.

9    Q.    Did they yell at you?

10   A.    No.  No, they didn't.

11   Q.    Did they -- did they raise their voice and point their

12   finger at you at any time?

13   A.    One of them got a little upset.

14   Q.    And by "a little upset," what does that mean?

15   A.    Well, he just -- when they were questioning me, he was

16   like -- just like, "Don't you remember stuff?"  Just getting on

17   to me.

18   Q.    Were you all three sitting down there?

19   A.    In the bedroom?

20   Q.    Yes.

21   A.    Yes.

22   Q.    You testified you were sitting on the bed and they were in

23   the chairs, correct?

24   A.    Yes.

25   Q.    And they never stood up over the top of you and pointed

1   their finger at you, did they?

2   A.    No.

3   Q.    They never drew their weapon and pointed at you, did they?

4   A.    No.

5   Q.    Okay.  Now, when you were back there not in handcuffs, at

6   one point -- and the reason that you wanted to retire -- go

7   back to the bedroom to talk to these agents was because you

8   wanted a little bit of privacy so your family didn't hear this

9   conversation; isn't that correct?

10  A.    No.  They just asked me if I wanted to go to the back

11  bedroom -- I mean, if the bedroom was -- if I had another place

12  to go.  They didn't want to take me to my bedroom.

13  Q.    Sure.  But as you testified a little bit ago, you sort of

14  knew why they were there, didn't you?

15  A.    Yes, I knew why they were there.

16  Q.    So you didn't really want your wife and your three

17  children to hear this conversation, did you?

18  A.    Oh, no.

19  Q.    Okay.  So you wanted the privacy back there with the

20  agents; isn't that correct?

21  A.    Yeah, I guess so.

22  Q.    Given the nature of the conversation, correct?

23  A.    Yes, sir.

24  Q.    All right.  Now, when you were back there, the door was

25  closed, correct?

1    A.    Yes.

2    Q.    And while you were back there on more than one occasion

3    or, let's say, at least one occasion, one of the agents said,

4    "It's getting a little bit warm in temperature in here.  Would

5    you like for us to open the door?"  Isn't that correct?

6    A.    I guess so, yes.  I think so, yes.

7    Q.    And you said, "No, no.  That's okay.  Let's leave the door

8    closed, because I don't want my wife and kids to hear this."

9    Isn't that correct?

10   A.    I didn't say that.

11   Q.    Did you say, "No, let's leave the door closed"?  Isn't

12   that correct?

13   A.    Yes.

14   Q.    And at the beginning of the interview they told you that

15   it was a non-custodial interview.  You were not in custody,

16   didn't they?

17   A.    Yes.

18   Q.    All right.  And they also told you that you're in your own

19   home and you're free to get up, get something to drink, get

20   some food?  Didn't they tell you all that?

21   A.    Yes, but I didn't feel that way.

22   Q.    But they told you that; isn't that correct?

23   A.    Yes.

24   Q.    And they told you you were free to get up and go to the

25   bathroom if you wanted to; isn't that correct?

1    A.    Yes.

2    Q.    And, in fact, you did, in fact, get up and go use the rest

3    room at one point; is that correct?

4    A.    That's correct.

5    Q.    And the bathroom sink doesn't work in there, so you were

6    free to then go into the kitchen and wash your hands; isn't

7    that correct?

8    A.    Yes.

9    Q.    In fact, you were also -- a moment ago you said something

10   about -- you said, "I think I want to talk to my lawyer."

11   Isn't that what you said?

12   A.    Yes.

13   Q.    Did they say no, you're not allowed to talk to your

14   lawyer?

15   A.    They said, "Why do you need to do that?"

16   Q.    And did you say, "Well, I really want to talk to him"?

17   Did you ever say anything like that?

18   A.    I said, "I think I need to."

19   Q.    Okay.  "I think I need to."

20         And then you were given an opportunity to make a

21   phone call, were you not?

22   A.    Uh --

23   Q.    You were allowed to make a phone call at one point,

24   weren't you?

25   A.    Yeah, to my brother.

1    Q.    And when you made that phone --

2    A.    The --

3    Q.    Let me ask the question first.  You said that you wanted

4    to call your boss, but you couldn't remember his phone number;

5    isn't that correct?

6    A.    Yes.

7    Q.    So you were allowed to make another call, and you called

8    your brother; isn't that correct?

9    A.    Yes.  He's my supervisor.

10   Q.    Okay.  Your brother is your supervisor --

11   A.    Yes.

12   Q.    -- at work?

13   A.    Yes.

14   Q.    Okay.  And so when you called your brother, you told him

15   that there were some agents there questioning you; isn't that

16   correct?

17   A.    No.  I told him that I was going to be late for work and

18   that -- and he told me, "Well, just go ahead and take care of

19   what you need to take care of there."

20   Q.    In fact, isn't it actually true that you spoke on the

21   phone with your brother, and the agents were right there,

22   correct?

23   A.    Uh-huh.

24   Q.    And they heard you, and they could hear him through the

25   speaker on the phone, correct?

1  A.   Yes.

2  Q.   And, in fact, your brother advised you not to talk to

3  them; isn't that correct?

4  A.   He did not say that.

5  Q.   Okay.  In addition to being allowed to go to the bathroom,

6  go to the kitchen, wash your hands, make a phone call, all

7  those sorts of things, a couple of times -- it was in the

8  morning, so a couple of times your kids came -- or one of the

9  agents came and knocked on the door and said, "Hey, your kid

10  needs X," or something like that, "to get dressed"; isn't that

11  correct?

12  A.   That's correct.

13  Q.   And you were in one of the kids' rooms, correct?

14  A.   That's correct.

15  Q.   And you were allowed to get up and go through the drawers

16  and get what the kids needed to provide that to the agents

17  asking for it; isn't that correct?

18  A.   I think the agent got it.

19  Q.   But you had to find it in the drawer, did you not?

20  A.   The clothes?

21  Q.   Yes.

22  A.   I think so, yeah.

23  Q.   Okay.  So you were able to get up, go through the drawers,

24  get what your children needed, and provide it to the agents,

25  correct?

1   A.   Correct.
2   Q.   Okay.  And after you made all the statements and you were
3   asked if you wanted to make a written statement and you went
4   out to -- the kitchen table, I believe it was, correct?
5   A.   Yes.
6   Q.   And you sat down to make the -- to write that statement.
7   You started writing the statement, correct?
8   A.   That's correct.
9   Q.   And you got maybe a paragraph or so long; isn't that
10  correct?
11  A.   That's correct.
12  Q.   And then the agents came in and stopped you, correct?
13  A.   That's correct.
14  Q.   And they told you that you're going to be under arrest,
15  and so, "Now we need to read you your Miranda rights," correct?
16  A.   Yes.
17  Q.   And at that point you responded, "Oh, so I'm not free to
18  go anymore," or, "I'm not allowed to go," or, "I'm not going to
19  be staying," something along those lines.  Do you recall that?
20  A.   No, I don't recall that.
21  Q.   You don't recall making any statements along those
22  lines --
23  A.   No, I don't.
24  Q.   -- when they said you were under arrest?
25  A.   No, I don't.

1   Q.   And when you were finally -- when you were told that you
2   were under arrest, after I had authorized prosecution against
3   you by phone and when they told you you were under arrest, you
4   were read your Miranda rights, correct?
5   A.   That's correct.
6   Q.   And at that time you said, "No, I don't want to talk to
7   you anymore.  I want to talk to my attorney," correct?
8   A.   I didn't even say that.
9   Q.   What did you say?
10  A.   I just said, "Okay."
11  Q.   Okay.
12  A.   I mean --
13  Q.   Did you express a desire for an attorney at that point?
14  A.   No.
15  Q.   Okay.
16          MR. BERRY:  Nothing further.
17          THE COURT:  Mr. Gallivan, anything else?
18          MR. GALLIVAN:  Briefly, Your Honor.
19                  REDIRECT EXAMINATION
20  BY MR. GALLIVAN:
21  Q.   Mr. Cavazos, if I were to tell you right now, "Look,
22  you're free to leave.  You can get up and walk out if you
23  want," would you feel like you could?
24  A.   No.
25  Q.   So just saying it doesn't make it so, does it?

1    A.    No.

2    Q.    You have to look at everything that's going on at the

3    time?

4    A.    Yes.

5    Q.    All right.   Thanks.

6              MR. GALLIVAN:   Pass the witness.

7              MR. BERRY:   No further questions, Your Honor.

8              THE COURT:   Mr. Cavazos, from the time the officers

9    got there until they formally arrested you, what was the --

10   what's your understanding -- what's your approximation of how

11   much time had passed?

12             THE DEFENDANT:   About four hours.

13             THE COURT:   Okay.   And the time that the officers --

14   from the time they took you to the back bedroom until you were

15   formally arrested, how long was that time, approximately?

16             THE DEFENDANT:   Probably about three.   Three and a

17   half, maybe.

18             THE COURT:   All right.   That's all.   You can step

19   down.   Thank you.

20             Mr. Gallivan.

21             MR. GALLIVAN:   Call Agent Mitchell, Your Honor.

22             THE COURT:   Okay.

23             (Pause)

24             THE COURT:   I'm sorry.   Who did you call?

25             MR. GALLIVAN:   Agent Mitchell, Your Honor.

1        MR. BERRY:  His name is LeAndrew Jason Mitchell.

2        THE COURT:  Okay.

3        MR. BERRY:  He was one of the agents that talked to

4   or interviewed Mr. Cavazos.  He's with ICE.

5        (The witness was sworn)

6        THE CLERK:  Have a seat.

7        THE COURT:  Would you state your name for me, please?

8        THE WITNESS:  It's LeAndrew Mitchell.

9        THE COURT:  You may proceed, Mr. Gallivan.

10       LeANDREW MITCHELL, DEFENDANT'S WITNESS, SWORN

11                     DIRECT EXAMINATION

12  BY MR. GALLIVAN:

13  Q.   Agent Mitchell, what service do you work for?

14  A.   Department of Homeland Security.

15  Q.   Is that what we refer to as ICE?

16  A.   Immigration and Customs, yes, sir.

17  Q.   How long have you been an agent there?

18  A.   Two years.

19  Q.   Were you an agent anywhere else before that?

20  A.   No, sir.

21  Q.   Okay.  You were in the courtroom when Mr. Cavazos

22  testified about this incident, correct?

23  A.   Yes, sir.

24  Q.   The Government in their response has already admitted that

25  you didn't read him his Miranda rights until the arrest,

 1  correct?

 2  A.    Yes, sir.

 3  Q.    And that there was an interrogation because you were

 4  asking questions, correct?

 5  A.    Yes, sir.

 6  Q.    All right.  The facts that he laid out as to what

 7  happened, would you agree that those were accurate?

 8  A.    Somewhat, yes, sir.

 9  Q.    Okay.  What would you say he left out?

10  A.    When he was at the kitchen table, we didn't immediately go

11  into the bedroom.  We removed his handcuffs.  After I asked him

12  whether there were any more weapons in the house, he said the

13  only weapon there was the rifle they found in the room.

14  Q.    Okay.  Just to make sure we are clear, this is the --

15  after you first arrived, took him out of bed, and you put him

16  at the kitchen table?

17  A.    Yes, sir.

18  Q.    Okay.

19  A.    Yes, sir.  Once he said there were no more weapons, we

20  removed the handcuffs.  We sat and talked at the kitchen table

21  probably a good five minutes just --

22  Q.    Talked about what?

23  A.    It being early in the morning, I asked him if there was

24  any coffee.  We were just chitchatting.

25  Q.    Okay.  Were you waiting on the other officers to clear the

1   rest of the house?

2   A.   Yes, sir.

3   Q.   Okay.

4   A.   Afterwards, as he said -- actually, Special Agent Tarango

5   asked him if there was somewhere private we could speak.  He

6   suggested the back bedroom.  We went into the bedroom to speak.

7   Q.   And how far is the bedroom from the kitchen?  Do you

8   recall?

9   A.   Not -- a good five or ten feet, perhaps.

10  Q.   Based on what Mr. Cavazos said, you go in the bedroom.  He

11  sits on the bed.  You and the other agents sit in the chairs.

12  The bedroom was closed.  Is that correct?

13  A.   Yes, sir.

14       Before that, there was only one child's chair in the

15  bedroom.  I actually asked him if we could retrieve a chair

16  from the kitchen.

17  Q.   And when you say you asked him, you're talking about

18  Mr. Cavazos?

19  A.   Yes, sir.

20  Q.   And I assume he said, "Sure.  Get a chair"?

21  A.   Sure.  Yes, sir.

22  Q.   At this point, from when you unhandcuffed him and you go

23  to the bedroom, how much time has elapsed?

24  A.   Five minutes.

25  Q.   During that five minutes, was he free to get up and leave?

1    A.    Yes, sir.

2    Q.    So if he would have just got up and walked out of the

3    house, you wouldn't have done anything?

4    A.    Once the house was clear?

5    Q.    Well, if he had walked out of the house?

6    A.    Walked out of the house?  During the five minutes?

7    Q.    During that period of time.

8    A.    No, sir, I would not have allowed him to leave, because he

9    was detained --

10   Q.    That's my point.

11   A.    -- for the search.

12   Q.    You wouldn't have allowed him to leave, correct?

13           MR. BERRY:  Your Honor, can he answer the question?

14           THE COURT:  Yeah.  Let him finish his answer, and

15   then you can restate.

16           Let's start all over again.  Ask your question again.

17   BY MR. GALLIVAN:

18   Q.    The question was, during that period when you took off the

19   handcuffs and went to the bedroom, was Mr. Cavazos free to

20   leave the house?

21   A.    From when we took the handcuffs off, the house was still

22   being searched.

23           THE COURT:  Answer the question, yes or no.  Would he

24   have been allowed to leave the house?

25           THE WITNESS:  Yes, sir.

BY MR. GALLIVAN:

Q.   So after you took the -- to make sure I understand --

A.   Uh-huh.

Q.   -- after you took the handcuffs off, if he had got up and said, "I'm not doing this," and walked out of the house, he would have been free to do so?

A.   Yes, sir.

Q.   You wouldn't have stopped him?

A.   No, sir.

Q.   None of the agents would have stopped him?

A.   No, sir.

Q.   Okay.  So you get to the bedroom.  You go in, sit down, and you start talking, correct?

A.   Yes, sir.

Q.   At this point if Mr. Cavazos would have said, "You know what?  I'm not doing this," gets up and walks out, would you have stopped him?

A.   No, sir.

Q.   You would have let him go?

A.   Yes, sir.

Q.   Now, he did get up and go to the rest room, correct?

A.   Yes, sir.

Q.   I believe you and Agent Tarango followed him?

A.   Yes, sir.

Q.   Somebody searched the bathroom to make sure there weren't

1  any weapons in there before he went in there, correct?

2  A.    Yes, sir.

3  Q.    When he went to the rest room, you made him leave the door

4  open?

5  A.    Cracked.

6  Q.    Cracked.  Sorry.

7  A.    Yes, sir.

8  Q.    Then he went to the kitchen, washed his hands, went back

9  to the bedroom, correct?

10  A.    Yes, sir.

11  Q.    From when you went back to the bedroom till the time you

12  went back to the kitchen, how much time elapsed?

13  A.    I'm sorry?

14  Q.    Between after he went to the rest room and washed his

15  hands in the kitchen and y'all went back to the bedroom,

16  between that point and when you went back to the kitchen for

17  him to start writing out what y'all asked him to write out, how

18  much time elapsed?

19  A.    Possibly 45 minutes to an hour.

20  Q.    During that period of time, if he would have said, "I'm

21  not doing this," got up and walked out, what would you have

22  done?

23  A.    Nothing.

24  Q.    I'm having a hard time believing that you wouldn't have

25  done anything during this entire period, Agent Mitchell.  You

1   get a search warrant to go get him, correct, or go to the

2   house?

3   A.    To search the house, yes, sir.

4   Q.    You go in at -- approximately what time in the morning was

5   it?

6   A.    6:00 a.m.

7   Q.    Still dark outside?

8   A.    Yes, sir.

9   Q.    You go into the house early morning.  You presume he's

10  asleep.  It's dark outside.  You put him in handcuffs, search

11  the rest of the house.  And then you say, "Oh, yeah, if he

12  would have just up and left, we wouldn't haven done anything"?

13  A.    Yes, sir.  He wasn't in custody.

14  Q.    Do you recall him asking for an attorney when you first

15  got to the bedroom?

16  A.    No, sir.

17  Q.    You don't recall him saying that?

18  A.    No, sir.

19  Q.    After you interrogated him in the bedroom and you asked

20  him to write it out and y'all went to the kitchen, you and

21  Agent Tarango left the kitchen; is that correct?

22  A.    Yes, sir.

23  Q.    If I understand what I've read correctly, you were on the

24  phone with the U.S. Attorney's Office at that point?

25  A.    Yes, sir.

1  Q.    How much time between when you left the kitchen and when

2  you went back to the kitchen?

3  A.    Probably five to ten minutes.

4  Q.    And during that conversation, you were told to arrest him;

5  is that correct?

6  A.    Yes, sir.

7  Q.    So you go back into the kitchen, and what do you tell

8  Mr. Cavazos?

9  A.    Special Agent Tarango told him to stop his statement.  And

10  he actually took the notepad.  We told him he was now in

11  custody and we had to read him his rights.

12  Q.    You go into his house at 6:00 in the morning, dark

13  outside, and you started asking him all these questions.  Why

14  didn't you feel compelled to read him his rights earlier?

15  A.    When I spoke to him, he wasn't in custody, and at no point

16  did we intend to take him into custody.

17  Q.    You knew that if he was in custody, as you keep saying,

18  that you couldn't ask him all these questions, or he may not

19  answer these questions, correct?

20  A.    Could you repeat the question, sir?

21  Q.    You know from your training that if he was in custody, as

22  you keep saying, that you would have to read him his rights and

23  that he may or may not answer your questions, correct?

24  A.    Yes, sir.

25        MR. GALLIVAN:  Pass the witness.

1          THE COURT:  Mr. Berry.

2          MR. BERRY:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. BERRY:

5   Q.   Good morning, Agent Mitchell.  Let's start at the end for

6   just a minute and we'll backtrack a bit.

7          After all of the interview and he was taken to the

8   kitchen table and wrote that statement, then Agent Santana

9   called.  I authorized prosecution.  You were informed of that,

10  correct?

11  A.   Yes, sir.

12  Q.   And you and Agent Tarango went in to Mr. Cavazos at the

13  kitchen table, correct?

14  A.   Yes, sir.

15  Q.   And at that point is when you notified him, "Hey, stop

16  writing.  You are under arrest," correct?

17  A.   Yes, sir.

18  Q.   When you said that to him, did he make any response or

19  make any statements to you at that moment?

20  A.   Yes, sir.

21  Q.   What did he say?

22  A.   He said, "Wait" -- well, something to the effect, "Wait.

23  What do you mean?  Like, I'm not free to go?"

24          And I told him, "No.  We're going to have to take you

25  in."

1    Q.    Okay.   And explain to the Court -- you know, the words

2    themselves may be somewhat bland.   Explain to the Court the way

3    you interpreted it based upon his demeanor and his tone and

4    when he said that to you at that moment.

5    A.    Well, he started shaking, so -- in my opinion, up to that

6    point he thought that once we left he was going to be able to

7    go to work; he was free to leave at any point.

8    Q.    And, in fact, that's what he was telling his brother,

9    "I'll be late," not "I'm not coming in," correct?

10   A.    Yes, sir.

11   Q.    But at that moment, you changed the situation by telling

12   him he's under arrest, correct?

13   A.    Yes, sir.

14   Q.    And he -- something clicked with him, and he realized,

15   "Wait a minute.   The game has now changed"?

16            MR. GALLIVAN:   Objection, Your Honor.   Calls for

17   speculation.

18            THE COURT:   Sustained.

19   BY MR. BERRY:

20   Q.    At that point in your mind, when you were observing

21   Mr. Cavazos, did you observe a change that was significant to

22   you?

23   A.    Yes, sir.

24   Q.    Explain that.

25   A.    His hands began to shake.   He actually started crying.

1    And he asked if -- for me to clarify that he wasn't free to go.

2    And I informed him -- informed him that he was not.

3    Q.    Because, in fact, earlier you had told him he was free to

4    go?

5    A.    Yes, sir.

6    Q.    Okay.  You said he started shaking and crying.  Had he

7    been calm previously?

8    A.    Yes, sir.

9    Q.    Throughout your interview?

10   A.    Yes, sir.

11   Q.    Had he cried at any time during your interview before?

12   A.    No, sir.

13   Q.    Okay.  Now, there seems to be some -- most of the facts

14   seem to be fairly clear from Mr. Cavazos, but there seems to be

15   a discrepancy on the amount of time that this interview took.

16   So could you clarify for the Court -- I believe Mr. Cavazos --

17   we just heard him say it was about three hours that you were in

18   the room interviewing him.  Is that correct?

19   A.    No, sir.

20   Q.    How much time would you estimate you were in the room

21   interviewing him?

22   A.    Actually interviewing?

23         THE COURT:  How much time in the room?

24   A.    An hour and a half.

25   Q.    An hour and a half?

1    A.    Yes, sir.

2    Q.    Okay.  And does that include him getting up, going to the

3    bathroom, and coming back?

4    A.    No, sir.  That's in the room.

5    Q.    In the room?

6    A.    (Indicating in the affirmative)

7    Q.    Okay.  And, again, he was not in handcuffs?

8    A.    No, sir.

9    Q.    Okay.  You heard Mr. Cavazos say that early on he said, "I

10   think I need an attorney."  Do you recall that?

11   A.    No, sir.

12   Q.    He never -- he never made any request or even a tacit

13   request for an attorney during that time period, before he was

14   Mirandized?

15   A.    No, sir.

16   Q.    Did he ultimately say that he wanted to talk to an

17   attorney --

18   A.    Yes, sir.

19   Q.    -- after he was Mirandized?

20   A.    Yes, sir.

21   Q.    But before that, no mention of an attorney?

22   A.    No, sir.

23   Q.    In fact, who did he ask to talk to if he talked to anyone?

24   A.    He wanted to talk to his boss.

25   Q.    And when he couldn't get ahold of his boss --

1   A.   Well, he further explained -- he later explained that his

2   boss was his brother, and that's who he called.

3   Q.   Oh, okay.  Gotcha.

4        And so he was able to talk to him?

5   A.   Yes, sir.

6   Q.   And let's clear this up, this factual dispute up as well.

7   Were you able to hear that conversation that he had with his

8   brother?

9   A.   Yes, sir.

10  Q.   You heard Mr. Cavazos's side of it at least, correct?

11  A.   Yes, sir.

12  Q.   And could you also hear the brother on the phone?

13  A.   Yes, sir.

14  Q.   And what did you hear the brother -- or Mr. Cavazos say to

15  the brother and then in return?

16  A.   Mr. Cavazos told his brother that he would be late to

17  work.  His brother told him, "Yes, I already heard what's going

18  on.  Don't say anything.  Call your lawyer."

19  Q.   Okay.  So his brother indicated that he knew there were

20  police there or something?

21  A.   Yes, sir.

22  Q.   And his brother told him, "Don't talk"?

23  A.   Yes, sir.

24  Q.   Did Mr. Cavazos tell you, "Hey, my brother just told me I

25  shouldn't say anything"?

1    A.    No, sir.

2    Q.    Did Mr. Cavazos continue to talk to you at that point?

3    A.    Yes, sir.

4    Q.    Explain to the Court why you had him leave the door

5    cracked a little bit to the bathroom.  Why didn't you give him

6    complete and total privacy with a complete and closed, locked

7    door?

8    A.    When he asked to go the bathroom, I asked one of the

9    agents if it had been searched yet.  We had a search warrant

10   for electronic media, so I didn't want thumb drives or media

11   cards or anything to be flushed down the toilet.  So I asked

12   him to leave it cracked for that purpose and also for officer's

13   safety as far as blades, knives, things that are often kept in

14   a rest room.

15   Q.    And, in fact, did you also -- were you also concerned

16   about the Defendant's own safety?

17   A.    Yes, sir.

18   Q.    Could he have hurt himself in there?

19   A.    Yes, sir.

20   Q.    Okay.  Would you -- how would you describe the tone of the

21   interview in that bedroom between yourself, Agent Tarango, and

22   Mr. Cavazos?

23   A.    It was very calm and relaxed, somewhat like we're talking

24   now.

25   Q.    Did you ever raise your voice to Mr. Cavazos?

1  A.    No, sir.

2  Q.    Did Agent Tarango ever raise his voice to Mr. Cavazos?

3  A.    No, sir.

4  Q.    Did you ever stand -- you or Agent Tarango ever stand up

5  and try to intimidate Mr. Cavazos?

6  A.    No, sir.

7  Q.    Did you ever point your finger at him?

8  A.    No, sir.

9  Q.    Did you ever draw your weapon on him?

10  A.    No, sir.

11  Q.    Did you ever reach over and tap your gun and give him a

12  wink?

13  A.    No, sir.

14          MR. BERRY:  Nothing further.

15          THE COURT:  Anything else, Mr. Gallivan?

16          MR. GALLIVAN:  No, Your Honor.

17          THE COURT:  Thank you very much, Agent Mitchell.  You

18  may step down.

19          (Witness excused)

20          THE COURT:  Anybody else you would like to call?

21          MR. GALLIVAN:  We rest, Your Honor.

22          (Defendant rests)

23          THE COURT:  Okay.  Mr. Berry, anything you would like

24  to add?

25          MR. BERRY:  We'll go ahead and call Agent Tarango.

1      THE COURT:   Agent Tarango.

2      (The witness was sworn)

3      THE CLERK:   Have a seat.

4      THE COURT:   You may proceed.

5      MR. BERRY:   Thank you, Your Honor.

6      ERIC TARANGO, GOVERNMENT'S WITNESS, SWORN

7                    DIRECT EXAMINATION

8   BY MR. BERRY:

9   Q.   Good morning, Agent Tarango.   You work for ICE as well?

10  A.   That's correct.

11  Q.   Sir, how long have you worked for ICE?

12  A.   A little over four years.

13  Q.   Four years?

14  A.   Yes, sir.

15  Q.   And where do you work out of?

16  A.   I work out of the Alpine office.

17  Q.   Okay.   And you were present on September 1st, the day

18  Mr. Cavazos's house was searched?

19  A.   Yes, I was.

20  Q.   You and Agent Mitchell, were you part of the entry team?

21  A.   No.   We came after the entry team.   After the entry team.

22  Q.   And explain to the Court briefly what the difference is

23  between the entry team and you guys coming in right at the end

24  there.

25  A.   The primary purpose of the entry team is to clear and

1    secure the residence.  And our primary function was to

2    interview Mr. Cavazos.

3    Q.    Okay.  And is that by design that you and Agent Mitchell,

4    the ones tasked with interviewing the subject, are not part of

5    the entry team?

6    A.    Yes.  That's the case agent.

7    Q.    All right.  Explain to the Court why that's important.

8    A.    It's important so we, as interviewers, are -- at that

9    point in time we're not geared up in raid gear or so forth as

10   the entry team.  We come in a more casual dressed manner.

11   Q.    And is that to put the Defendant or the subject at the

12   time more at ease?

13   A.    That's correct.

14   Q.    Is it to make him feel less intimidated?

15   A.    Yes, sir.

16   Q.    So by design you're trying to make him feel more

17   comfortable?

18   A.    Yes.

19   Q.    Are you trying to make him feel more comfortable in his

20   own home?

21   A.    That's correct.

22   Q.    To make him feel like he is not in custody?

23   A.    Yes, sir.

24   Q.    Okay.  Now, you agree that Mr. Cavazos was placed in

25   handcuffs in the beginning?

1    A.    That's correct.

2    Q.    And is that for officer's safety?

3    A.    Yes.

4    Q.    And how long would you say he was in handcuffs?

5    A.    After we came in shortly after it was cleared and

6    secured -- I know that's one of the first things I did when I

7    came in the residence.  No less than five minutes.

8          I met with Mr. -- with Agent LeAndrew, and we met

9    with Mr. Cavazos, who was sitting there in between the kitchen

10   and the -- well, actually, in the dining area.  And I had him

11   stand up.  I removed the handcuffs.

12   Q.    You said no less than five minutes.  No more than how many

13   minutes?

14   A.    I would say about three minutes or so from when I came in

15   the house I encountered -- I met with Mr. Cavazos.

16   Q.    So just a few minutes?

17   A.    Yes, sir, a few minutes.

18   Q.    And you were the ones that took his handcuffs off?

19   A.    Yes, sir, it was me.

20   Q.    And then you and Agent Mitchell and Mr. Cavazos went back

21   to the bedroom, correct?

22   A.    Yes.

23   Q.    And did you or Mr. -- or Agent Mitchell close the door?

24   A.    I did.

25   Q.    Okay.  At any point did you or Agent Mitchell ask

1    Mr. Cavazos if he wanted to open the door?

2    A.    Agent Mitchell did.

3    Q.    And how many times would you say he was asked if he wanted

4    to open the door?

5    A.    It was pretty hot in there.  I know at least twice.

6    Q.    At least twice?

7    A.    Yes, sir.

8    Q.    And each time what did Mr. Cavazos say?

9    A.    "No.  We'll just leave it closed."

10   Q.    And did you understand or have any understanding at that

11   time as to why he wanted to keep it closed despite the heat?

12   A.    Initially, I told him it was okay with us leaving it

13   closed.  I explained with him why.  I told him this was a

14   matter of privacy that we needed to discuss with him and there

15   was no need for his wife or kids to hear what we were

16   discussing.  He said, "No, no, that's fine.  I don't want them

17   to hear either."

18   Q.    If he had asked to open the door, would you have let him?

19   A.    Oh, yes, sir.

20   Q.    In fact, you were offering to?

21   A.    Yes, sir.

22   Q.    Okay.  But you thought for his own benefit and his

23   family's benefit keeping it closed was better?

24   A.    Yes, sir.

25   Q.    Okay.  Prior to him making any incriminating statements,

1    he went to the bathroom; isn't that correct?

2    A.   Yes, sir.

3    Q.   And maybe I made a statement there.  But when he went to

4    the bathroom, was it before or after he made incriminating

5    statements?

6    A.   That was before.

7    Q.   Okay.  And so he was free to get up, go to the bathroom?

8    A.   Yes.

9    Q.   Did he then go into the kitchen?

10   A.   Yeah, he went to the kitchen and washed his face, I

11   believe brushed his teeth as well.

12   Q.   Because it was morning, right?  He had been sleeping?

13   A.   Yes, sir.

14   Q.   Okay.  And it was after that that he came back to the

15   bedroom?

16   A.   Yes.

17   Q.   And is that when the interview began --

18   A.   That's when the interview began.

19   Q.   Let me finish my question --

20   A.   Oh.

21   Q.   -- so the court reporter can get us down.

22        And it was after all of that free movement that he

23   came back to the bedroom, correct?

24   A.   Yes.

25   Q.   And then the interview began in earnest?

1    A.    Yes.

2    Q.    And it wasn't until after all that free movement that he

3    began making statements, correct?

4    A.    That's correct.

5    Q.    Okay.  Were you and Agent Mitchell the only two agents

6    that stayed in the room with Mr. Cavazos and interviewed him?

7    A.    Yes, sir.

8    Q.    Okay.  And about how long would you say Mr. Cavazos was in

9    that back bedroom with you and Agent Mitchell?

10   A.    An hour, hour and a half.

11   Q.    Not three hours like he said?

12   A.    No, sir.

13   Q.    Do you recall agents coming to the bedroom door, knocking

14   on it, and asking about kids' clothes?

15   A.    Yes, sir, several times.

16   Q.    And what was Mr. Cavazos allowed or not allowed to do in

17   that circumstance?

18   A.    He would get up and grab shoes, underwear.  Whatever the

19   kids needed at that time, he was the one grabbing it.  We

20   remained seated.

21   Q.    You didn't say, "You tell -- you point out which clothes,

22   and I'll pull it out of the drawer"?

23   A.    No, sir.

24   Q.    You let him go through the drawers?

25   A.    Yes, sir.

1    Q.    And after the -- all the oral statements, was he taken to

2    the kitchen so he could write out a written statement?

3    A.    We asked him if he could write out a statement for us, and

4    he said yes.  We had to find a flat surface.  And he went to

5    the kitchen, and he sat there and started writing out the

6    statement.

7    Q.    And you and Agent Mitchell left the room?

8    A.    Yes, sir.

9    Q.    Did you come back into the room and tell him, "Stop

10   writing.  You're under arrest"?

11   A.    After we were told by the case agent that he was being

12   placed in custody, we came back to the kitchen, and I

13   immediately told him, "Stop writing your statement."  I took

14   the clipboard.  And that's when Agent Mitchell advised him of

15   his rights.

16   Q.    Did you -- do you recall Mr. Cavazos saying anything when

17   he was informed he was under arrest?

18   A.    Yes, sir.  His first reaction, he started shaking.  And he

19   started crying at the time.  He goes, "So I'm not going to

20   go -- I'm not free to go?"

21         And I told -- Agent LeAndrew told him, "No.  You're

22   under arrest."

23   Q.    And how did you interpret that shaking and crying and

24   statement of "I'm not free to go?"

25   A.    I believe to that point he thought he was free to go till

1    that time.  And due to his reaction, that's when he knew he

2    wasn't going to be free to go.

3    Q.    Had he been shaking or seemed nervous -- you know,

4    excessively nervous before that?

5    A.    No, sir.

6    Q.    And any time during the interview in that back room did he

7    shake?

8    A.    No.

9    Q.    Did he cry at any time back in that bedroom?

10    A.    No, sir.

11    Q.    Okay.

12              MR. BERRY:  Pass the witness.

13              THE COURT:  Mr. Gallivan.

14                        CROSS-EXAMINATION

15    BY MR. GALLIVAN:

16    Q.    Sir, did you happen to record this interview with

17    Mr. Cavazos?

18    A.    No, sir, it was not recorded.

19    Q.    Do you have the ability to record interviews?

20    A.    No, sir.  We're not -- it's not common practice in our

21    agency.

22    Q.    I understand that.  I said, do you have the ability?

23    A.    Yes, sir.

24    Q.    You have tape recorders or --

25    A.    Yes, sir.  We have tape recorders, yes, sir.

1  Q.   And so you could have rerecorded it?

2  A.   Yes.

3  Q.   And then we could hear exactly what happened?

4  A.   Yes.

5  Q.   But you didn't do that?

6  A.   No.

7  Q.   The fact that Mr. Cavazos was able to go to the bathroom,

8  agents stood right outside the door while he was in the

9  bathroom, correct?

10  A.   One agent did.

11  Q.   And did you and Agent Mitchell just sit in the bedroom,

12  waiting for him to come back?

13  A.   No.  I was with the forensic agent at that time.

14  Q.   So when Mr. Berry talks about this "free movement," it's

15  not like Mr. Cavazos just got up and started wandering around

16  the house.  There was an agent following him, watching what he

17  was doing, correct?

18  A.   Yes.

19  Q.   You said that the handcuffs were removed within roughly

20  three to five minutes after you entered the house.  Who put the

21  handcuffs on Mr. Cavazos?

22  A.   I don't know, sir.

23  Q.   And you have no idea how long he sat there in handcuffs,

24  do you?

25  A.   No, I don't know.  I can't say.

1    Q.    Thanks.

2              MR. GALLIVAN:  Pass the witness, Your Honor.

3              THE COURT:  Mr. Berry.

4              MR. BERRY:  Nothing further, Your Honor.

5              THE COURT:  Thank you very much, Agent.  You can step

6    down.

7              THE WITNESS:  Thank you, sir.

8              (Witness excused)

9              MR. BERRY:  The United States rests.

10             (Government rests)

11             THE COURT:  Okay.  Mr. Gallivan, anything on

12   rebuttal?

13             MR. GALLIVAN:  No, sir.  The Defendant closes.

14             (Defendant closes)

15             THE COURT:  Okay.  Be glad to hear argument,

16   Mr. Gallivan.

17             MR. GALLIVAN:  Your Honor, as the Government points

18   out in their response to our motion, they've agreed that

19   Mr. Cavazos was not read his Miranda rights and that he was

20   interrogated and that the only issue is, was he in custody or

21   not.

22             Despite the agents' testimony, oh, that he was free

23   to leave, I think the evidence is clear that he was in custody.

24   They come into his house 6:00 a.m. in the morning.  It's dark.

25   They wake him out of bed, put him in handcuffs.  And then they

think, "Well, we took the handcuffs off; so, therefore, he wasn't in custody," but he was not free to leave.

While he got to go to the bathroom -- yeah, he had to go to the bathroom, but they still watched him.  They wouldn't let him leave.  They watched him as he went into the kitchen. They watched him as he went back into the bedroom.  And they still interrogated him and kept asking him questions even after he initially asked for an attorney.

Now, that may not have been, "I want to talk to my attorney," but it was a request for an attorney which was denied, and they continued to ask him questions.

Again, the issue is, was he in custody.

The Court is well aware of the law, what that means, et cetera.  And the Court is well aware that to make that determination you put what a reasonable person would do in that situation.

Under these circumstances I think any reasonable person would not have felt free to leave.  The cops, the police bust into your home, wake you out of a sleep, and start asking you a bunch of questions.  The average person, average reasonable person, would not have felt they were free to leave, which is what Mr. Cavazos felt in this case.  He was not free to leave.

Therefore, we would argue that he was in custody and any statements that he made, whether oral or in writing, should

1  be suppressed in this matter.

2      Thank you.

3      THE COURT:  Mr. Berry.

4      MR. BERRY:  Yes, Your Honor.

5      I know this hearing has been postponed or was

6  continued for a period of time, but I believe Your Honor has

7  our memorandum of law in opposition to the motion to suppress

8  statements.  And it sets forth the law -- you heard the facts

9  here today, but it sets forth the law.  We filed it back in

10  November.

11      I would just ask the Court to take into account Agent

12  Mitchell and Agent Tarango's testimony and notice how much of

13  it fits with what Mr. Cavazos acknowledges was also true, which

14  was that he was taken out of handcuffs.

15      He was asked, you know, if there was a private place

16  to speak.

17      He was asked if he wanted to open the door, and he

18  said no.

19      He was allowed to get up and go to the bathroom and

20  go to the kitchen, wash his hands, wash his face, brush his

21  teeth.

22      He was allowed to make a phone call to his brother,

23  who specifically advised him to not talk.

24      He was allowed to go through the drawers in the

25  bedroom where they were to provide clothes for his kids.

1          All of these facts lead to a very clear conclusion in
2     the United States' position that he was not in custody.
3          One of the easiest ways I think to think of custody
4     versus non-custody is what would be the counter facts here.  He
5     was in his own home.  He wasn't taken to the police station,
6     which would be a counter fact that would fall more in his
7     favor.  He wasn't taken out to a police car and placed in the
8     back in handcuffs and locked the doors and that sort of thing.
9          There was no yelling at him.  There were no guns
10    drawn in his face during the interview.  There was no
11    intimidation.  They didn't stand over him, point fingers at
12    him, try to intimidate him in any way.  It was described as
13    polite and amicable.
14         The counter facts to that, as I just set forth, would
15    have suggested something more along the lines of custody.
16         So when you compare and contrast what those facts
17    would have been versus what we have here, it's difficult to
18    understand how the cops -- how the agents here could have done
19    anything different to let Mr. Cavazos -- and make it clear not
20    just to him from a subjective standpoint, because as the Court
21    knows, it's not a subjective standard; it's an objective
22    standard -- but to make it clear to the objectively reasonable
23    person, hypothetical person, that he's not in custody, that he
24    is free to move about.
25         Obviously, the agents are not going to let him walk

1    into another room, close the door, rifle through things,

2    perhaps get a weapon and come back out at them or hurt himself.

3    Keeping an eye on him for officer's safety and for his own

4    safety is not the same thing as keeping him in custody.

5           And I think it's clear from the facts, both from

6    Agent Mitchell and Agent Tarango, that they did everything they

7    were supposed to do in this case, everything we want agents to

8    do when they're talking to subjects of an investigation.  They

9    were polite.  They were not intimidating.  They provided him as

10   much leeway as was reasonable under the circumstances and did

11   not try to restrain him in any way.

12          Mr. Cavazos testified that he made some statement

13   about "I think I need an attorney," or, "I think I want to talk

14   to an attorney."  And I don't know if the argument now is that

15   that was a clear invocation.  We could argue that.  It doesn't

16   seem to be the issue here.  But I would submit that on that

17   particular point, it was not a clear invocation of the desire

18   or right to counsel.  But more importantly, it's controverted

19   by the agents themselves who said no, he never actually said

20   that.  In fact, the only time he requested an attorney was

21   after he was told he was going to be placed under arrest.

22          And I would point to those facts for the Court to

23   compare to what had transpired before that, which is once he

24   was told he was under arrest and he was Mirandized, something

25   changed in his mind.  He started shaking.  He started crying.

1    And he made statements about how he's no longer free to get up,

2    move about, go to work, whatever, which is in direct contrast

3    to the way he had felt prior to that, which is he was free to

4    move about.  He wasn't shaking.  He wasn't intimidated.  He

5    wasn't crying.  It was relaxed.  It was casual.  He was free to

6    leave.  Therefore, he was not in custody.

7          We'd ask this Court to deny the Defendant's motion to

8    suppress his oral statements as well as the written statement

9    that he began to write prior to being placed in custody, that

10   that should still come in as well.

11         THE COURT:  Anything else on rebuttal?

12         MR. GALLIVAN:  Briefly, Your Honor.

13         THE COURT:  Yes, sir.

14         MR. GALLIVAN:  First, Agent Mitchell testifies that,

15   "Oh, yeah.  If he had got up, we would have let him leave."

16   However, he wasn't free to go to the bathroom without them

17   watching.  He wasn't even free to wash his hands without them

18   watching.  So I find that very hard to believe.

19         All we ask, Your Honor, is that they should have read

20   him his rights.  It takes less than two minutes.  At least then

21   it gives him, Mr. Cavazos, the opportunity to decide do I want

22   to cooperate or do I not.  They didn't do that in this case.

23         Any reasonable person would have felt they were in

24   custody and not free to leave.  They should have read him his

25   Miranda rights.  They should have given him the choice to

1  decide whether to answer these questions or not.  They didn't

2  do it; therefore, it should be suppressed.

3          Thank you.

4          MR. BERRY:  Your Honor, I do have one more brief

5  statement.

6          I meant to mention a case.  I don't want to belabor

7  the cases that we put in our motion, but since we filed that

8  motion, there was a case that came out.  I'm handing a copy to

9  defense counsel right now.  It's United States versus Hargrove.

10  It is 625 F.3d 170.  And it is a Fourth Circuit case.  It is a

11  published opinion, obviously not binding on this Court, but

12  it's a published opinion from a sister court of appeals that we

13  believe is highly persuasive.

14          And I would just ask this Court if it doesn't rule

15  right now to take a very close look.  The facts of that case

16  are eerily similar to this case.  It was a defendant who was

17  charged with transfer of obscenity to a minor and enticement,

18  just as this Defendant was.  It was a case where the agents

19  went in and conducted a search warrant, just as the agents did

20  here.

21          They cleared the residence, just as the agents did

22  here.  And the -- some of the firearms -- some of the agents

23  had firearms drawn, but those were placed back.

24          The subject was told he was free to leave, told he

25  was not under arrest, was allowed to sit at the kitchen table,

1 was permitted to get up and smoke a cigarette, was freely

2 moving around, got up and dealt with his cat at one time.

3       All of those facts went to the Court's ultimate

4 finding that the District Court was correct in denying the

5 motion to suppress those statements. And we would just ask

6 this Court to follow that same logic here because the facts are

7 identical.

8       Thank you.

9       THE COURT: I will give -- Mr. Gallivan, I will give

10 you till next Wednesday if you want to respond to that case at

11 all.

12       This is -- let's see. Today is the 14th. I know you

13 have got a plea -- I will extend the plea deadline until the

14 Court announces its ruling on this. I will extend the plea

15 deadline.

16       And do you move for a continuance of the February

17 trial setting, Mr. Gallivan?

18       MR. GALLIVAN: I haven't, but I will, Your Honor.

19       THE COURT: Okay. Any objection from the Government?

20       MR. BERRY: No, sir.

21       THE COURT: Okay. And I'm troubled by some things.

22 I don't understand why we wouldn't go ahead and read their

23 rights when they're there. I mean, it just does away with all

24 of this right now. It just does away with all of this.

25       And why the rights -- I mean, we're not talking --

this case is clearly distinguishable from the Martin case that

is -- that was cited by the Government in its brief.

First of all, in Martin there wasn't a search

warrant.  The officers said, "May we come in?"

And the subject of the -- the subject of the

interview said, "Sure, come on in."

The interview was 15 minutes long rather than if you

take the officer's thing, it's an hour and a half long.

There were two officers that were present rather than

all the officers that were present for the search.  And I know

that two officers were there.

If you look at the factors that are set forth in U.S.

versus Bengivenga -- I may be pronouncing that wrong.  I'm sure

I am.  B-E-N-G-I-V-E-N-G-A, 845 F.2d 593, which are factors

that are discussed in a number of these cases.  If you look at

the length of the questioning, the location of the questioning,

the number of the officers present during questioning, and the

type and manner of questioning -- I think the length of

being -- even if you take the officers' testimony of an hour

and a half, that type of interrogation is a factor in favor

that the Defendant is in custody.

The location of the questioning.  I recognize it was

at his home, but it was there because they were there on a

search warrant, which is a whole different issue than coming up

and saying, "We would like to visit with you about some

1    questions.  Do you mind if we come in?"  They had invaded the

2    room.  And they had legally invaded the home, but it was still

3    there.  And I think that mitigates both ways, I think, in that

4    question.

5          The number of officers present during the

6    questioning.  Again, I believe that there is officers that are

7    there that -- there's two that do the questioning, but there

8    are other officers throughout the home that had come in

9    during -- in the home.

10          And the type and manner of questioning.  In the case

11   cited by the Government -- and I can't remember now if it's the

12   Fike case or it may be the case that I just cited, the District

13   Court case of Martin.  But the officers said, "We'll leave

14   anytime you want us to leave."  The officers said that.  "We'll

15   leave anytime you would like for us to leave."  And, again, I

16   don't remember if it's in Martin, but it's in one of the cases

17   cited by the Government.

18          That's not the case here.  There was never

19   anything -- in fact, the officers weren't going to leave until

20   they finished their search of the facility.  So I think there

21   are some real issues here.

22          I'm going to review the Fourth Circuit case cited by

23   the Government.  I'm going to be in Pecos on Tuesday and

24   Wednesday.  Monday is a federal holiday.  Tuesday and

25   Wednesday.  So I'll get you -- I may not have a written

1    opinion, but I will have a notice to you of the Court's

2    decision by Wednesday when we get back.

3            But I just think from law enforcement's standpoint

4    it's so much safer, particularly on circumstances like this, to

5    go ahead and give the warnings, and then we don't have to go

6    through all of this.  We don't know if Mr. Cavazos wouldn't

7    have gone ahead and given the same interview that he would

8    have.

9            MR. BERRY:  And I'm not going to belabor this hearing

10   and argue that point.  I would ask -- or say one thing and ask

11   another.  One, the question is would Your Honor, based upon

12   some of the comments that you have made here today, would it be

13   helpful if I provided a supplemental brief addressing a couple

14   of those issues?

15           THE COURT:  No.

16           MR. BERRY:  And then the other thing, I would say

17   that I understand the Court's position that, yes, of course, it

18   would be simpler if they had asked or Mirandized him, but the

19   question is not would it have been simpler.  It's was it

20   required.

21           And there is -- obviously, from the law enforcement's

22   perspective, they may -- they have to be able to make that

23   judgment call and say, "We don't think he's in custody, and

24   we're going to make sure that we establish facts that show

25   that.  And if we do that, then the law protects us from the

1  issue of suppression, because he's not in custody, so we don't

2  have to Mirandize him."

3          And they have to make a judgment call to say this

4  person, if we go strong and say, "You're in custody.  Here's

5  your rights.  You better -- you need to talk to us or don't

6  talk to us" --

7          THE COURT:  You don't have to say any of those

8  things.  They don't have to -- and it's not done that way.  And

9  it's done by saying, "Mr. Cavazos, you have the right -- we

10  would like to interview you.  You have the right not to make a

11  statement.  If you do make a statement, it can be used against

12  you.  You have the right to -- you have the right to stop at

13  any time."

14          MR. BERRY:  Sure.

15          THE COURT:  And it's not screaming.  It's not

16  hollering.

17          MR. BERRY:  I'm not suggesting --

18          THE COURT:  Let me finish.  It's not with a gun to

19  their heads or anything like that.

20          But this is a different situation, Mr. Berry.  When

21  they know -- I mean, I've read the affidavit for the search

22  warrant.  They -- they know what facts they're looking for.

23          This isn't a situation where they kind of stumble on

24  somebody or something of that nature.  They knew what they were

25  looking for.  They knew the facts -- what they believed to be

1    the facts behind the case.  They are there at 5:00 or 6:00, or

2    whatever time it is in the morning, banging on the door, coming

3    in.

4         And it just makes things go so much better for them,

5    for the Defendant, for the court system, and everything.

6         MR. BERRY:  No disagreement there, Judge.

7         THE COURT:  Yeah.  So --

8         MR. GALLIVAN:  I was under the impression the Court

9    was going to give me till either Wednesday or Thursday to file

10   a response.

11        THE COURT:  I will give you till Wednesday to file a

12   response.  I will let you know something next week after I get

13   your response.

14        MR. GALLIVAN:  Yes, sir.

15        THE COURT:  You have till Wednesday at 5:00 to file a

16   response.

17        And this is purely to the issue of the case -- the

18   Fourth Circuit case cited by Mr. Berry today.  And you are

19   limited to three pages.

20        MR. GALLIVAN:  Okay.

21        THE COURT:  Okay.

22        MR. BERRY:  If he goes over, do I get a surreply?

23        THE COURT:  If it goes more than three pages, you can

24   file a reply.

25        MR. BERRY:  Thank you.

1    THE COURT:  All right.  You gentlemen are excused.

2  And Mr. Cavazos is remanded back to the custody of the United

3  States Marshals.

4    (Hearing adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I, TODD ANDERSON, United States Court Reporter for the

United States District Court in and for the Western District of

Texas, Midland/Odessa Division, hereby certify that the above

and foregoing contains a true and correct transcription of the

proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 28th day of January, 2011.


/s/Todd Anderson
TODD ANDERSON, RMR, CRR
United States Court Reporter
200 E. Wall, Rm. 116
Midland, Texas  79701
(432) 686-0605