```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                     MIDLAND/ODESSA DIVISION

 3

 4  UNITED STATES OF AMERICA,      *    No. MO-10-M-300
                                   *         MO-10-CR-271
 5          Plaintiff,             *
                                   *
 6  VS.                            *    SEPTEMBER 9, 2010
                                   *
 7  MICHAEL ANGELO CAVAZOS,        *
                                   *
 8          Defendant.             *    MIDLAND, TEXAS
                                   *
 9  ------------------------------------------------------------
10              TRANSCRIPT OF DETENTION HEARING
               BEFORE THE HONORABLE DAVID COUNTS
11               UNITED STATES MAGISTRATE JUDGE
    ------------------------------------------------------------
12

13  APPEARANCES:

14    For the Government:      UNITED STATES ATTORNEY'S OFFICE
                               BY: BRANDI YOUNG
15                             Assistant U.S. Attorney
                               400 West Illinois, Suite 1200
16                             Midland, Texas

17

18    For the Defense:        LAW OFFICES OF LAURA A. CARPENTER
                               BY: LAURA CARPENTER
19                             506 N. Sam Houston
                               Odessa, Texas  79761
20

21

22  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
23

24

25
```

1          **I N D E X**

2

3                                                           <u>PAGE</u>

4   <u>FOR THE GOVERNMENT</u>:

5      William Heath Hardwick
           (Direct Examination by AUSA Young)................. 7
6          (Cross Examination by Ms. Carpenter).............. 21
           (Redirect Examination by AUSA Young).............. 26
7          (Recross Examination by Ms. Carpenter)........... 27

8

9   <u>FOR THE DEFENSE</u>:

10     Sylvia Villalba
           (Direct Examination by Ms. Carpenter)............. 29
11         (Cross Examination by AUSA Young)................. 31

12     Marissa Massey
           (Direct Examination by Ms. Carpenter)............. 34
13         (Cross Examination by AUSA Young)................. 37
           (Redirect Examination by Ms. Carpenter)........... 44
14

15

16              * * * * * *

17

18

19

20          **E X H I B I T S**

21                                                      <u>ADMITTED</u>

22  <u>FOR THE GOVERNMENT</u>:

23     No. 1.  Photo copy of text messages................. 38

24

25

          FEDERAL COURT REPORTERS OF SAN ANTONIO (210) 340-6464
          10100 REUNION PLACE, STE. 660, SAN ANTONIO, TEXAS 78216

1  (START TIME, 3:31:32 P.M.)

2          THE COURT:  I'll call U.S. versus Michael Angelo

3  Cavazos, Cause Number MO-10-M-300.

4              Announcements from the Government, please.

5          AUSA YOUNG:  Brandi Young on behalf of the United

6  States, Your Honor.

7          THE COURT:  Thank you, Ms. Young.

8          MS. CARPENTER:  Laura Carpenter on behalf of the

9  defendant.  We're present and ready, Your Honor.

10         THE COURT:  Thank you, Ms. Carpenter.

11             Mr. Cavazos, good afternoon.

12         DEFENDANT CAVAZOS:  Good afternoon, sir.

13         THE COURT:  We are here today for a preliminary

14  examination and detention hearing.

15             Ms. Young, you may proceed.

16         AUSA YOUNG:  Thank you, Your Honor.

17             At this time we'll call Special Agent Heath

18  Hardwick.

19         MS. CARPENTER:  And Your Honor, may we approach the

20  bench?

21         THE COURT:  Sure.  Pick a side.

22  (OFF THE MIC BENCH CONFERENCE, 3:33:10 TO 3:43:03 P.M.)

23         THE COURT:  Ladies and gentlemen, if you are -- the

24  Rule's been invoked by the parties.  What the Rule is, just

25  briefly so you'll know, it's human nature -- I do it, everyone

1  does it -- when you hear somebody else giving a story or

2  testifying, we sometimes tend to forget or maybe to agree with

3  or disagree with the way that person's testifying.  So the Rule

4  is -- is created for basically truth in our -- in our courts.

5          So what we want is everyone's independent

6  recollection when they testify, either in this hearing or any

7  future hearing, including the trial.  And so what the Rule is

8  designed to do is to exclude anyone from any testimony that

9  might be about that case at all so that we don't, as humans --

10 like I said, human nature -- we don't change our story in some

11 way.  Even if we're not realizing that we -- that we're doing

12 it.  And I know I do it and I certainly know my kids do it.

13 That's just the way -- that's just the way that all works.

14         So, I'm going to exclude everyone from the hearing

15 that is a witness today or a witness -- a potential witness in

16 the case in any fashion in any future hearing or trial.  What

17 that means is you cannot sit in and listen to the testimony

18 today or at any other future proceeding.  Obviously you can be

19 in the courtroom when you are testifying.

20         And when you're outside and you're not in the

21 courtroom, you cannot discuss, except with the attorneys, either

22 side, the facts of the case.  It's just so that we get what

23 everybody knows about that particular incident.

24         And some of -- of you may be witnesses as to one

25 little issue, it may not be much, but it's -- it's designed to

1    protect the truth.  And so if you're here and you're going to

2    testify today or you -- or you're a witness in the case in any

3    way, I'm going to require that you leave, go outside, go home,

4    whatever you want to do.  If the attorneys need you to stick

5    around, then -- then they'll -- they'll tell you.

6           And then I believe the alleged victim is not here,

7    is not present, is what I'm told by the Assistant United States

8    Attorney.  She has a right to be here if she wants to be.  She's

9    chosen not to be.  She has a right, I believe, to have a

10   representative here.  But we're going to make every

11   precaution -- take every precaution we can that that

12   representative that stays in here is not a witness later in

13   the -- in the trial or the -- any hearings.

14          Ms. Young, for the Government, has professed, and

15   Ms. Carpenter has as well, to try their best to figure that out.

16   If at some point the person who stays in as the representative

17   of the alleged victim becomes a witness, then we'll deal with

18   that as we go.  But today we're making our best, good faith

19   effort that that representative that stays in here today is not

20   going to be a witness at any future time.

21          So with that, I'll give you all a few minutes to

22   figure that out, filter through and see who's going to stay and

23   who's not going to stay.  And that would include law enforcement

24   officials as well.  The case agent obviously may stay.

25          I'll take a minute.

```
 1  (OFF THE RECORD, 3:46:35 TO 3:50:00 P.M.)

 2           THE COURT:  Thank you.  You may be seated, please.

 3             All right, we're in lots -- we got a lot less people

 4  here.

 5                     WILLIAM HEATH HARDWICK,

 6  having first been duly sworn, testified to the following:

 7

 8           THE COURT:  And just for the record, I'll say we've

 9  cleared the courtroom almost.  We've got a few people here, I

10  know, for some other hearings later.

11             Go ahead, Ms. Young.

12           COURTROOM DEPUTY:  Would you state your name and spell

13  your last name for the record.

14           THE WITNESS:  William Heath Hardwick.  Last name is

15  spelled H-a-r-d-w-i-c-k.

16           AUSA YOUNG:  And, yes, Your Honor, for the purposes of

17  the record we have asked that members of the victim's family

18  that could be potential witnesses -- at this stage I was not

19  comfortable with making those decisions.  There is one

20  representative in the courtroom today.  I have spoken with her

21  and she is here for support only.  She is actually the

22  sister-in-law of the father of the victim.

23           THE COURT:  Okay.  Thank you for being here, ma'am.

24           AUSA YOUNG:  And so she is going to stay in the

25  courtroom.  With that, the Government does not have any
```

1    potential -- other potential witnesses in the courtroom at this

2    time.

3              THE COURT:  All right.  Thank you.

4                Ms. -- tell you what, Ms. Carpenter, for the record,

5    does that meet with your satisfaction, your clients?

6              MS. CARPENTER:  It is, Your Honor.  We don't believe

7    that the one individual that's still in the courtroom would

8    potentially be a witness in this case.

9              THE COURT:  Very well.  Thank you.

10             Go ahead, Ms. Young.

11                         DIRECT EXAMINATION

12   BY AUSA YOUNG:

13   Q    I know you stated your name for the record.  Could you tell

14   the Court how you're employed.

15   A    I'm a Special Agent with Immigration and Customs

16   Enforcement in the Midland, Texas office.

17   Q    And how long have you been with what we refer to as ICE?

18   A    Since 2003, for seven years.

19   Q    And as part of your duties with ICE, are you assigned to

20   investigations regarding immigration matters?

21   A    Yes, ma'am.

22   Q    And additionally, are you assigned to investigations

23   regarding uses of internet, phone, those sorts of communication

24   facilities to engage in sexual activity with minors?

25   A    Yes, ma'am, I am.

1  Q    And that includes child pornography, as well as enticement

2  type charges; is that correct?

3  A    That is correct.

4  Q    At some point in time did you become involved in the

5  investigation regarding Michael Cavazos, who we're here in the

6  courtroom today for?

7  A    Yes, ma'am, I did.

8  Q    And when did you become involved in this investigation?

9  A    Probably in the later part of July of this year.

10 Q    And how did you become involved?

11 A    I was advised by the case agent, Juanita Santana, of a

12 pending investigation involving Michael Cavazos sending text

13 messages and videos of himself to a minor.

14 Q    And has that minor being given a pseudonym to this point in

15 time?

16 A    Yes, ma'am.

17 Q    And is that K.K.B.?

18 A    That is correct.

19 Q    Based on this information you received from Agent Santana,

20 what did you and your follow agents do first?

21 A    Initially information was obtained from the Crane County

22 Sheriff's Office, who received a complaint from the victim's

23 mother.  The victim's mother gave a statement stating that her

24 child had made an out cry to her stating that Michael Cavazos

25 had sent her inappropriate text messages, to include a picture.

1   Q    And the inappropriate text messages and picture, what did

2   the picture contain?

3   A    Mr. Cavazos had exposed his penis and taken a picture of it

4   with a cell phone.

5   Q    And based on this initial complaint from the minor child's

6   mother to the Crane County Sheriff's Department, what did ICE

7   do?

8   A    ICE conducted the regular investigation as far as locating

9   and identifying Michael Cavazos and also obtained a statement

10  from the victim.

11  Q    And the victim that we've previously identified as K.K.B.,

12  what is her age?

13  A    Fifteen years old.

14  Q    And the age at the time of the incident with Mr. Cavazos?

15  A    Fifteen years old.

16  Q    And you stated that you also identified Mr. Cavazos.  Who

17  did you identify him to be?

18  A    Michael Cavazos resided at 700 South Vivian in Crane,

19  Texas.

20  Q    And did you also determine his approximate age?

21  A    Yes.  Yes, ma'am, he's 28 years of age.

22  Q    You stated that you took a statement from the victim

23  herself; is that correct?

24  A    I did not.  Special Agent Santana did.

25  Q    And I apologize.  Thank you for correcting me.

1              What did the victim say?

2   A    The victim stated in August of last year she met Michael

3   Cavazos at a family get together and over a period of -- until

4   currently -- or I should say in July -- Mr. Cavazos had sent her

5   text messages, had requested a friend request on the social

6   networking site of Facebook.  And the victim stated that since

7   her parents were friends of Mr. Cavazos, she too included him as

8   a friend on her Facebook page.

9              She stated that messages were sent back and forth

10  between the two, and over a period of time the messages became

11  sexual in nature.

12  Q    Did the victim elaborate the sexual nature of the text

13  messages?

14  A    Some of the things that he asked about was if he was -- if

15  he was with her in a dark room, what would she do?  Would she

16  kiss him?  Would she go all the way, which to mean have sexual

17  intercourse with her -- or with him?  Those type of questions.

18  Q    Did the victim also relate an incident where she had had

19  physical interaction with Mr. Cavazos?

20  A    Yes, ma'am.  She relayed an incident in July where Michael

21  Cavazos brought over a golf cart that -- to her residence, which

22  the victim's mother was going to take pictures of him and the

23  victim on the golf court -- golf court.  During that time

24  Mr. Cavazos had placed his hand on her thigh and up toward her

25  crotch and she got up off the cart and walked away from the golf

```
 1   cart.  At the time the victim's mother didn't know that that had
 2   occurred.
 3   Q    At some point in time did the victim relay this information
 4   to her mother?
 5   A    Yes, ma'am, she did.
 6   Q    And was that the basis for the initial report to the Crane
 7   County Sheriff's Office?
 8   A    That is correct.
 9   Q    After Agent Santana spoke with the victim, what did ICE
10   investigators do next?
11   A    We were advised that Mr. Cavazos had an incident with a
12   prior employer back in August of 2009 in which he was terminated
13   from a job for -- I'm not sure if we knew about it at the time
14   what he was terminated for, but through the investigation at the
15   end, we found out that he had used a cell phone to make a
16   sexually explicit video of himself ejaculating on a video and
17   then he sent that video to his personnel cell phone and also
18   sent that video to the victim's aunt as well.
19             During the company's investigation, a recording was
20   made by the employing Human Resources Director and -- and
21   through his investigation and through the statement made by
22   Mr. Cavazos, he was terminated due to making that video.
23   Q    And just so I have this correct, ICE investigators became
24   aware of an incident regarding Mr. Cavazos's termination from a
25   prior employer; is that correct?
```

1   A    Yes, ma'am.

2   Q    And through investigation you were able to determine the

3   facts and circumstances surrounding his termination; is that

4   correct?

5   A    That is correct, ma'am.  We also obtained the cell phone

6   that was used to make that video.  I have found the video in the

7   phone of -- of what was described to us and we have a recording

8   of that video.

9   Q    And you have actually viewed the video; is that correct?

10  A    Yes, ma'am.  I also analyzed the data inside the cell phone

11  and -- and know that he sent it to his own cell phone and he

12  also sent that video to the victim's aunt.

13  Q    Based on this information and I would assume -- well, let

14  me just ask you:  The company that Mr. Cavazos was terminated

15  from, who were they?

16  A    I don't recall.  I can find out for you.  I want to say it

17  was Tetco, or if that's his current employer.  I don't remember

18  which business that was before.

19  Q    The prior employer was cooperative with the investigation;

20  is that correct?

21  A    Yes, ma'am.

22  Q    And in fact you became in possession of the cell phone

23  through the prior employer; is that correct?

24  A    Yes, ma'am.  And an audio cassette tape of the recording

25  conducted over the phone with Mr. Cavazos and the person

1   conducting the investigation in Houston.

2   Q    And so those were all property of the company; is that

3   correct?

4   A    That is correct, ma'am.

5   Q    And they voluntarily turned those over to law enforcement?

6   A    Yes, ma'am, they did.

7   Q    Okay.  Based on this information, what did you and your

8   fellow agents do next?

9   A    Special Agent Santana applied for and was granted a search

10  warrant for the residence of Mr. Cavazos at 700 South Vivian in

11  Crane.  We entered the residence after knocking.  Mr. Cavazos's

12  wife, or common law wife, answered the door.  Mr. Cavazos was

13  separated from his wife.  He was momentarily detained until we

14  cleared the house.  We located a shotgun inside of a closet.

15  Q    And let me just stop you right there, Agent Hardwick.  You

16  stated that Mr. Cavazos answered the door, correct?

17  A    No, ma'am, his wife did -- or his common law wife did.

18  Q    The common law wife answered the door, he was present and

19  he was temporarily detained; is that what you stated?

20  A    Yes, ma'am, until we cleared the house.

21  Q    And when you say "cleared the house," explain to the Court

22  what the purpose of doing that is.

23  A    To ensure there's no weapons or anything that could hurt

24  the agents during the -- the search.

25  Q    Is there anyone else present at the house at that time?

1   A    Yes, ma'am, there were three children.  In the bed -- in

2   the master bedroom where Mr. Cavazos was, his youngest daughter

3   was sleeping on the floor on a bed and two -- two stepsons were

4   in another room.

5   Q    What happened next?

6   A    Mr. Cavazos was -- the handcuffs were removed after the

7   home was secure, and Mr. Cavazos was interviewed by two ICE

8   agents.

9   Q    Where did this interview occur?

10  A    In the furthest room in the -- in the home, in the youngest

11  son's room, the middle child's room.

12  Q    And who all was present for this conversation?

13  A    Special Agent Tarango and Special Agent Mitchell.

14  Q    And was the door open or shut?

15  A    The door was closed initially because the conversation --

16  they wanted to keep it -- they did not want anybody to overhear

17  the conversation, the wife and the children.  The residence is

18  extremely small, so and -- and the wood -- the flooring was hard

19  wood floors so sound could travel easily, so the room was shut.

20  However, the room was opened a little later because the

21  temperature inside the room got hot and it was opened up for

22  that reason.

23       Prior to the interview, Mr. Cavazos was advised that

24  he was not under arrest and they would like to speak to him

25  about the circumstances involving the victim, get his side of

1    the story.

2    Q    And did Mr. Cavazos in fact agree to speak to law

3    enforcement?

4    A    Yes, ma'am, he did.

5    Q    And was Mr. Cavazos free to leave at any time?

6    A    Yes, ma'am, he was advised that -- that he was in his home,

7    he was free to leave and use the rest room as he pleased, to go

8    the -- go to the rest room, walk around the house.  It's still

9    his home.  In fact, during the interview Mr. Cavazos did use the

10   rest room and went into the kitchen to wash his hands and face

11   and then returned back to the interview room.

12   Q    What did Mr. Cavazos relate to the agents that were

13   speaking to him?

14   A    Mr. Cavazos admitted knowing the victim, further admitted

15   to making a text message to her, exposing himself to her.  He

16   stated that he did this after he requested a photo from her, in

17   which he stated that the victim sent him two photos by text

18   message of herself.  And then returned by sending her a picture

19   of -- of his penis by text message.

20   Q    And when you say "sent text messages," these are actual

21   photographs that are contained in a text message; is that

22   correct?

23   A    That's correct, ma'am.

24   Q    And those are transmitted via cellular telephone?

25   A    Yes, ma'am.

1   Q    You stated that Mr. Cavazos was aware of who the victim

2   was.  Did he state how he knew her?

3   A    As a family friend.  When he met the victim's father back

4   in August, he got to know the family from that point.  My

5   understanding is that the families know each other.  Crane is a

6   very small town, so it's easy to know one another in that

7   home -- or in that -- that town.

8   Q    In addition to these admissions and admitting to sending

9   the photograph of his penis to this 14-year-old victim, did

10  Mr. Cavazos also admit to utilizing the social network on the

11  site of Facebook?

12  A    Yes, ma'am.  He stated that -- that he has an active

13  account.  It was also requested that if he would give us access

14  to his account, user names and passwords, which he did.  We have

15  that information.

16  Q    And if I have -- if I recall correctly, Mr. Cavazos also

17  stated that the 14-year-old victim had sent nude photographs of

18  herself; is that correct?

19  A    That's correct.  Two of them.  And she was 15.

20  Q    Based on this information, what did investigators do next?

21  A    Investigators contacted the United States Attorneys Office.

22  Information was relayed to U.S. Attorney Austin Berry.  Austin

23  Berry advised the agents to go ahead and place Mr. Cavazos under

24  arrest for the enticement of the child.

25  Q    In addition to the admissions made by Mr. Cavazos regarding

1    K.K.B., did he also make some admissions regarding speaking to

2    other females ranging in age from 14 to 17?

3    A    Yes, ma'am.  He stated he kept -- he had spoken with female

4    juveniles from the age of 14 and 17 in Crane through Facebook

5    and texting.  But he stated that none of those communications

6    involved sexting or -- or sending any type of explicit pictures

7    or receiving them.

8    Q    And you said "sexting," that's not been -- it's not a part

9    of the record here.  What is "sexting?"

10   A    "Sexting" was a phrase that Mr. Cavazos used during the

11   interview, which is known to law enforcement as a way of sending

12   a text message with an attachment to include a video picture or

13   even just wording alone in a sexual nature.

14   Q    So he stated he had contact with at least four other female

15   minor children ranging 14 to 17 years of age, but they did not

16   involve sexting; is that correct?

17   A    That's correct.

18   Q    Is the investigation regarding identifying those individual

19   minors continuing at this time?

20   A    Yes, ma'am.  Two have been identified.  And during those

21   messagings on -- on Facebook, one of the persons started

22   receiving information -- or messages from Mr. Cavazos back in

23   October of 2009.  The content of those discussions were not

24   sexual in nature; however, there is a pattern in the way he

25   spoke to these young girls; as far as he knew that they were

1    young, knew that they were in high school.  And in my

2    experience, appeared to be a grooming process.

3    Q    Two of the victims are still unidentified at this point in

4    time; is that correct?

5    A    That's correct.  If I'm -- if I'm not mistaken, I believe

6    one of the victims is not cooperating.

7    Q    So we have one that's not cooperating at this time?

8    A    If -- if I'm not mistaken, I believe that is that status.

9    Q    Did Mr. Cavazos also admit to a prior sexual relationship

10   with an under age child when he was 18 years old?

11   A    Yes, ma'am, he did.

12   Q    What did he admit to agents?

13   A    He said that when he was at -- when was 18 years of age he

14   had consensual sexual intercourse with a 14-year-old female in

15   Crane and he was arrested for that charge.  Mr. Cavazos stated

16   that it was consensual and that she had forced him -- herself

17   upon him, like to remove his pants, and she was the aggressor in

18   the incident.  We have since tried to find documents and

19   paperwork from that incident.  We have a booking sheet and a

20   criminal history sheet with his information on it; however, as

21   far as court paperwork or any reports go, we're still in the

22   process of looking for them, and Crane County Sheriff's Office

23   is still looking for them as well too.

24   Q    So you do not have any court documents that are easily

25   accessible showing he was ever prosecuted for this offense, but

1  you have been able to verified he was at least arrested for some

2  type of sexual offense when he was 18 years of age; is that a

3  fair statement?

4  A    Yes, ma'am.

5  Q    Okay.  As far as the search warrant that was executed at

6  the residence, did agents recover any other electronic media,

7  computers, those sort of things?

8  A    Numerous.  We seized more than 31 line items of media and

9  evidence; numerous VHS cassette tapes, some that upon their --

10  looking at them on face are pornographic in nature.  Some do not

11  have labels or stickers that we have to go through still.  As of

12  yesterday I finished copying the hard drives out of both the

13  laptop and the desktop computer.  I believe there's only one

14  cell phone that I have not gone through.

15          While at -- at the house I conducted a preview of

16  the laptop computer.  Due to time constraints I had to end it,

17  but during the review of the images in that computer it is very

18  hard core pornographic images I located on the hard drive.

19  Q    At this point in time are all of the images that you have

20  previewed or viewed of adults or are you able to say?

21  A    It's -- there were some pictures to me they looked young,

22  maybe 18 to 19 years of age.  But as far as anything that is a

23  child, you know, upon face -- looking at it, I did not see that.

24  Q    And you stated that you've made copies of the hard drive.

25  Is that what we typically refer to as mirrored images?

```
 1   A    Yes, ma'am.

 2   Q    And so in an effort not to alter or change anything that

 3   was on the hard drive, this is a process that's done by law

 4   enforcement; is that correct?

 5   A    That's correct, ma'am.

 6   Q    And then you will continue to forensically analyze these

 7   things; is that correct?

 8   A    Yes, ma'am.

 9   Q    As far as the difference between a preview and the full

10   analyzing of a laptop or computer, are there things that can't

11   be found on a preview that will be found or can be found if

12   they're there on a full analysis?

13   A    Yes, ma'am, there are things that can be found.

14   Q    And are those things that are typically what we hear of as

15   "lost space" or "dead space" or "unallocated space;" basically

16   things that have been deleted to a degree?

17   A    That is correct, ma'am.

18   Q    And you just haven't had time to review everything yet, is

19   that correct?

20   A    That is correct, ma'am.

21   Q    Upon completion of the search warrant, what did

22   investigators do next?

23   A    Mr. Cavazos was transported to the Odessa Detention Center

24   where he was held until initial appearance, I believe, on Friday

25   of last week, Friday or Thursday.  And all evidence was
```

1    transported back to our office where we're still conducting an

2    analysis of the evidence.

3    Q    And at this time the investigation of the items recovered

4    from Mr. Cavazos's home and the interviewing of other potential

5    witnesses or victims is ongoing; is that correct?

6    A    Yes, ma'am, it's still ongoing.

7    Q    And just to be clear for the purposes of this hearing, a

8    complaint was filed in this cause; is that correct?

9    A    Yes, ma'am.

10   Q    And that was sworn to by Juanita Santana, Senior Special

11   Agent?

12   A    That's correct, ma'am.

13   Q    And Ms. Santana's not here today, is she?

14   A    No, ma'am, she's not.

15   Q    Where she at?

16   A    She's in training in Virginia.

17   Q    She's out of town and unavailable to be here today; is that

18   correct?

19   A    That's correct?

20           AUSA YOUNG:  We'll pass the witness, Your Honor.

21           THE COURT:  Ms. Carpenter?

22                       CROSS EXAMINATION

23   BY MS. CARPENTER:

24   Q    You stated you had been with the agency since 2003?

25   A    Yes, ma'am.

1  Q    How long have you been handling dealing with these type of

2  offenses?

3  A    Last --

4  Q    Since 2003 or were -- did you do immigration and then move

5  into these type of offenses?

6  A    Beginning of my career with ICE, I was in Presidio and the

7  majority of cases were drug and immigration cases.  Since moving

8  to Midland in 2007, a majority have been sexual offense type

9  cases.

10  Q    Did you view the picture that was allegedly sent by

11  Mr. Cavazos to the victim?

12  A    No, ma'am, I have not seen that photo.

13  Q    You don't know if there is a photo, other than the

14  statement from the victim?

15  A    That is correct.

16  Q    Is there any proof, other than the statement from the

17  victim, that Mr. Cavazos himself sent her a picture?

18  A    Mr. Cavazos also admitted to the picture.

19  Q    And he did not admit that to you; is that correct?

20  A    It was not made to me.  It was to other agents.

21  Q    Did you see any of the text messages that were allegedly

22  sent between the victim and Mr. Cavazos?

23  A    No, ma'am, I did not.

24  Q    What about any Facebook messages back and forth?

25  A    I have viewed some Facebook messages that are in the case

```
 1   file from Special Agent Santana.

 2   Q    Those between Mr. Cavazos and the minor that's --

 3   A    Yes.

 4   Q    -- the victim in this case?

 5   A    Yes, ma'am.  There's only a few.  We have since requested

 6   subpoenas for those records, and as of -- as the time of the

 7   search warrant was written, we still have not received those

 8   records.  And as of today we still haven't received those

 9   record.

10   Q    Were any of these that you viewed sexual in nature?

11   A    I did not see any text messages between the two, so...

12   Q    No, I was talking Facebook.  You said no text messages, but

13   what about any Facebook mail?

14   A    Oh.

15   Q    Was any of that sexual in nature?

16   A    No, ma'am.  I have not seen sexual messages.

17   Q    And the aunt that allegedly was sent a video from

18   Mr. Cavazos's work phone, how old was she?

19   A    I believe she's 35.

20   Q    Okay.  And she worked for the same company that he did?

21   A    No, ma'am, she was working at a grocery store, I believe,

22   at the time that the incident occurred.

23   Q    In that video that you have viewed, is there anything

24   illegal?

25   A    Yes, ma'am, the video itself.
```

```
 1   Q     The video that was sent to the aunt?

 2   A     Yes, ma'am.

 3   Q     Other than it was on a work phone, is it an illegal video?

 4   A     He's utilizing a -- a telephone to send a pornographic

 5   video.

 6   Q     He's sending a video from one adult to another; is that

 7   correct?

 8   A     Yes, ma'am, that's correct.

 9   Q     You mentioned that there was a shotgun that was taken from

10   the house.  The shotgun was not illegally held by Mr. Cavazos,

11   was it?

12   A     No, ma'am, it was located in the closet, the master

13   bedroom.

14   Q     Were you there, present during the search warrant?

15   A     Yes, ma'am, I was.

16   Q     But you weren't present during any of the interview

17   process?

18   A     The interview of --

19   Q     Did you physically -- were you present when he -- you

20   interviewed -- they interviewed Mr. Cavazos?

21   A     I was not in the room while he was speaking to them.  I did

22   watch Mr. Cavazos when he did use the rest room and then went to

23   the kitchen to wash his hands and face.  But as far as when he

24   was being spoke to or speaking to agents, I was not present, no,

25   ma'am.
```

1    Q     Well, none of the statements that you've stated he made,

2    did you have personal knowledge to or were made to you?

3    A     No, ma'am.

4    Q     Was he given his Miranda rights?

5    A     No, ma'am, he was not.

6    Q     At any time was he told that he had the right not to speak

7    to the agents?

8    A     Yes, ma'am, he was.

9    Q     And when was that?

10   A     Initially in the interview by, I believe, Special Agent

11   Tarango that advised him that he didn't have to make a

12   statement, but they wanted to hear his side of the story.

13   Q     Did they advise him he had the right to have an attorney

14   present during that statement?

15   A     I was not present in the room.  I do not know.  But know he

16   was not advised of his Miranda rights.

17   Q     How many agents were present that day?

18   A     I believe I counted 15 during the -- before we entered the

19   residence.  But the ones that actually entered the residence

20   maybe eight, maybe half.

21   Q     So there's a small home, Mr. Cavazos is there, his wife's

22   there, his three children, 15 agents come up in his house and

23   then they go, Oh, but you really don't have to talk to us?

24   A     Not all 15 entered the home.

25   Q     The other minors that he is friends with on Facebook, is he

1  related to any of those individuals?

2  A    I don't know who he's related to or not.  Some last names

3  were Cavazos and I -- I don't know his lineage or family tree to

4  know who's related.

5  Q    So some of those others, of the four girls that you're

6  talking about, those are possibly family members?

7  A    Anything's possible right now.

8          MS. CARPENTER:  I have no other questions, Your Honor.

9          THE COURT:  Ms. Young?

10                      REDIRECT EXAMINATION

11  BY AUSA YOUNG:

12  Q    Just to clarify a few things.  Ms. Carpenter asked you if

13  we had any other evidence that the picture that was sent from

14  Mr. Cavazos to the 14-year-old minor existed other than the

15  14-year-old minor saying it existed.  Is that a fair statement,

16  or do we actually have other evidence?

17  A    We have other evidence, as Mr. Cavazos stated that he sent

18  that -- that picture.

19  Q    Mr. Cavazos specifically admitted that he sent a picture of

20  his penis to a 14-year-old minor who he knew, knew to be

21  14-years-old over his cellular telephone via a text message, is

22  that correct?

23  A    That is correct.

24  Q    And additionally, the text that exists, although you have

25  not physically seen them, is it simply that we know those exist

1  not only from the victim's statement but also from Mr. Cavazos'

2  admission that he sent those messages?

3  A    That is correct, yes, ma'am.

4  Q    At any point in time after the initial sweep of the

5  residence, was Mr. Cavazos detained?

6  A    Detained -- he was initially placed in handcuffs, but

7  after -- when we were advised by the U.S. Attorney's Office to

8  go ahead and place him under arrest, he was advised that he was

9  being placed under arrest.  Mr. Cavazos was in the middle of

10  writing a statement, and once we were advised that the U.S.

11  attorney office wanted him detained and arrested, the paper was

12  taken from Mr. Cavazos and he wasn't allowed to write any more

13  and he was advised of his Miranda warnings at that time.

14  Q    So when you spoke to the United States Attorney's office

15  and they made the decision to detain Mr. Cavazos or direct

16  agents, ICE, Immigration Customs Enforcement, to detain

17  Mr. Cavazos, he was immediately advised of his Miranda rights;

18  is that correct?

19  A    That is correct, ma'am.  I was present during the Miranda

20  reading.

21            AUSA YOUNG:  No further questions, Your Honor.

22            THE COURT:  Ms. Carpenter?

23                      RECROSS EXAMINATION

24  BY MS. CARPENTER:

25  Q    Did you personally hear Mr. Cavazos say that he sent a

1  picture of his penis to the minor in this case?

2  A    No, ma'am, I did not.

3  Q    The only evidence that you have at this point that this

4  occurred is the statement of the victim and the statement that

5  was taken from Mr. Cavazos at his home?

6  A    That is correct.

7  Q    And none of the statements that Mr. Cavazos made to the

8  agents were made after his Miranda rights, were they?

9  A    No, ma'am.  He invoked after he was advised of his Miranda

10  rights.

11  Q    But before -- when he gave those statements, he had not

12  been told he had the right to have an attorney present?

13  A    That is correct.

14          MS. CARPENTER:  No other questions, Your Honor.

15          THE COURT:  Ms. Young?

16          AUSA YOUNG:  Nothing further from this witness, Your

17  Honor.

18          THE COURT:  Thank you.  You may step down, sir.

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you so much.

21           Anything further, Ms. Young?

22          AUSA YOUNG:  Nothing as far as witnesses, Your Honor,

23  on the preliminary hearing or the detention.  We would obviously

24  have argument at the appropriate time.

25          THE COURT:  Thank you.

```
 1            Ms. Carpenter?

 2            MS. CARPENTER:  Your Honor I -- Mr. Diaz is the one

 3   that prepared the report and he is not present.  I would like to

 4   call him or someone from his office as a witness to this.

 5            THE COURT:  Okay.  Ms. Villalba, do you feel

 6   comfortable taking the stand?  If not, we can ask Mr. Diaz to be

 7   here at some other -- later date.  It's up to you.

 8

 9                        SYLVIA VILLALBA,

10   having first been duly sworn, testified to the following:

11

12            COURTROOM DEPUTY:  State your name and spell your last

13   name for the record.

14            THE WITNESS:  My name is Sylvia Villalba,

15   V-i-l-l-a-l-b-a.

16                        DIRECT EXAMINATION

17   BY MS. CARPENTER:

18   Q    How are you employed, Ms. Villalba?

19   A    I'm a Senior U.S. Pretrial Services Officer in Midland.

20   Q    And how long have you held that position?

21   A    Almost 13 years.

22   Q    And do you have a copy of the report that was made by

23   Mr. Diaz?

24   A    I do.

25   Q    And how long has Mr. Diaz, to the best of your knowledge,
```

```
 1  worked for the agency?

 2  A    I would say almost 12 years.

 3  Q    And in this report, after speaking with Mr. Cavazos and his

 4  family, what was the recommendation of Pretrial Services?

 5  A    That he be released on bond.

 6  Q    All right.  And what were the special conditions in

 7  relation to that bond?

 8  A    Basically for placement at Dismas Charities, placed on GPS,

 9  have a -- undergo an evaluation by Perry -- Dr. Perry Marchioni.

10  Basically that's a sex evaluation to see how -- if he's a danger

11  to the community; although that information is not available to

12  anyone but the judge and us.

13  Q    Was there any criminal history of conviction found on

14  Mr. Cavazos?

15  A    On March 5, 2001, he was arrested by the Crane County

16  Sheriff's Office for aggravated sexual assault of a child in

17  which apparently was never filed at the district clerk's office.

18  Q    So there was no criminal convictions of any kind?

19  A    Not that we were able to locate.

20  Q    Was there any other arrest record for Mr. Cavazos?

21  A    Not that we were able to locate.

22  Q    Did he have any ties to Mexico?

23  A    My understanding is he did not.

24  Q    Was he employed before the arrest?

25  A    Shows that he was for approximately two months.
```

1  Q    Per the report, does he have family that lives in Crane.

2  A    Yes.

3  Q    Okay.  And all of -- from all this information, Pretrial

4  Services felt like there were conditions of a bond that could be

5  met to, one, overcome the presumption that he might be a flight

6  risk and, two, to uphold the presumption that he might be a

7  danger to the community; is that correct?

8  A    Based on the information that we were provided on the

9  complaint and the information verified by family and the

10 information by the defendant.

11          MS. CARPENTER:  I have no other questions, Your Honor.

12          THE COURT:  Ms. Young?

13          AUSA YOUNG:  Just briefly, Your Honor.

14                      CROSS EXAMINATION

15 BY AUSA YOUNG:

16 Q    Ms. Villalba, do -- when you prepare a -- when a Pretrial

17 Services Report is prepared, you stated that you receive

18 information from the defendant; is that correct?

19 A    Correct.

20 Q    Defendant's family.  You try to verify the information

21 provided by the defendant?

22 A    Yes.

23 Q    And then any charging instruments that are available to you

24 at the time?

25 A    That's correct.

```
 1   Q    Are you aware of all of the facts and circumstances around

 2   the incident involved?

 3   A     No.   We are -- only view the information that's provided to

 4   us on the complaint, and that's basically it.

 5   Q     And in fact, as part of Pretrial Services, do you guys

 6   consider the -- the weight of the evidence or the type of

 7   evidence that's contained?

 8   A     No.

 9   Q     So that can't factor into your decision?

10   A     No.

11   Q     Additionally, one of the recommendations -- or a couple of

12   the recommendations I want to just talk about briefly, one is to

13   reside at Dismas Charities; is that correct?

14   A     Correct.

15   Q     As part of the Dismas Charities program, the defendant

16   that's on pretrial supervision awaiting trial is requested to

17   get a job, typically; is that correct?

18   A     Yes.

19   Q     And so they actually leave Dismas Charities, go to work and

20   come back, correct?

21   A     Correct.

22   Q     And another condition was GPS monitoring; is that correct?

23   A     Correct.

24   Q     And also the conditions you spoke about, no contact with

25   anyone under the age of 18, don't be around day cares, those
```

1   sort of things; is that correct?

2   A    Correct.

3   Q    Is there any way that a GPS monitor can tell us if

4   Mr. Cavazos leaves Dismas Charities and has contact with a

5   14-year-old girl?

6   A    It will be able to tell you he left Dismas Charities, but

7   it will not be able to tell you if he made contact with anyone.

8   Q    So if he leaves Dismas Charities, goes to where he's

9   supposed to go and comes back, his GPS monitoring will say he

10  complied with the conditions; is that correct?

11  A    That is correct.

12  Q    And there's nothing to verify or protect that he hasn't had

13  contact with one, ten, 15, 20, hundreds of under age children;

14  is that correct?

15  A    That's correct.

16  Q    Is there any condition that we can place on Mr. Cavazos to

17  make sure that he has no contact with children?

18  A    Not that we have available at this time.

19            AUSA YOUNG:  Pass the witness.

20            MS. CARPENTER:  I have no further questions, Your

21  Honor.

22            THE COURT:  Thank you.

23              You may step down.  Thank you ma'am.

24              Ms. Carpenter, anyone else?

25            MS. CARPENTER:  I have one witness that's in the

```
1   hallway.
2               THE COURT:  All right.
3               MS. CARPENTER:  Marissa Massey.
4               THE COURT:  Ms. Massey.  Would you ask Ms. Massey to
5   come on in.  Ms. Massey, Marissa Massey.
6                   Thank you, Marshal.
7
8                           MARISSA MASSEY,
9   having first been duly sworn, testified to the following:
10
11              COURTROOM DEPUTY:  Would you state your name and spell
12  your last name for the record.
13              THE WITNESS:  Marissa Massey, M-a-s-s-e-y.
14                         DIRECT EXAMINATION
15  BY MS. CARPENTER:
16  Q    Ms. Massey, what is your relationship to Mr. Cavazos?
17  A    Wife.
18  Q    And how long have you had a relationship with Mr. Cavazos?
19  A    Over seven and-a-half years.
20  Q    And how long have you lived with him?
21  A    Over seven and-a-half years.
22  Q    And do you and him have children together?
23  A    Yes, we do.
24  Q    And what age are those children?
25  A    Eight and six, and then I have a 15-year-old from a
```

1    previous relationship.

2    Q    And during all this time period they have lived with him as

3    well?

4    A    Yes, they have.

5    Q    During that time period that you've lived with him the last

6    seven and-a-half years, where have you resided?

7    A    The last, actually, six years we've been in the home that

8    we're in now, which is 700 South Vivian Street.

9    Q    And before that, where did you reside?

10   A    It was on Mary Street.   I don't know the exact address.

11   Q    To the best of your knowledge, how long has Mr. Cavazos

12   resided in Crane, Texas?

13   A    Twenty-eight years.

14   Q    Does he have any family to your knowledge that lives in

15   Mexico?

16   A    No, not that I'm aware of.

17   Q    Does he have any ties to Mexico?

18   A    No.

19   Q    How many family members does Mr. Cavazos have that live in

20   Crane or the surrounding counties?

21   A    Goodness, well over 20 or more.

22   Q    Would you say that his ties to Midland, Ector, Crane

23   Counties all are very strong?

24   A    Yes.

25   Q    Would there be any reason that he would leave if he were

```
 1  given a bond because of this case?
 2  A    No.
 3  Q    Okay.  Was he employed at the time that he was arrested?
 4  A    Yes, he was.
 5  Q    Where was he working?
 6  A    TL McNeese Trucking.
 7  Q    And are you employed?
 8  A    No, not at the moment.
 9  Q    How long have you been unemployed?
10  A    Over two years.  I had a temp job, but it was here and
11  there.  It was only when they needed somebody to fill in.
12  Q    Is Mr. Cavazos the sole support at this time of you and
13  your children?
14  A    Yes, he is.
15  Q    All right.  Now, for the record, you do get a child support
16  amount; is that correct?
17  A    I do.
18  Q    How much do you get in child support?
19  A    A little over $740 a month.
20  Q    Is that enough for you and the children to live on?
21  A    No.
22  Q    Do the best of your knowledge, is Mr. Cavazos going to be
23  able to have the job that he had before he was arrested if he
24  was released on bond?
25  A    His boss said that they would cross that bridge when they
```

1   got there.

2   Q    Do you have any reason to believe that he would be a danger

3   to society, particularly Crane, if he were released on bond?

4   A    No, I do not.

5   Q    Are you aware if he has any criminal history?

6   A    Not that I'm aware of.

7   Q    Okay.  Has he ever been convicted of any crime?

8   A    No.

9            MS. CARPENTER:  Pass the witness, Your Honor.

10           THE COURT:  Ms. Young?

11                      CROSS EXAMINATION

12  BY AUSA YOUNG:

13  Q    Ma'am, you're familiar with the victim in this case; is

14  that correct?

15  A    Yes.

16  Q    And the victim's family as well?

17  A    Yes.

18  Q    And in fact you've had contact with the victim and her

19  family; is that correct?

20  A    Not recently, no.

21  Q    Did you send them some text messages?

22  A    Not recently.

23  Q    Okay, when did -- when's the last time you sent them a text

24  message?

25  A    Probably in July.

```
1    Q    And what did you send them a text message -- what'd it say?
2    A    I couldn't remember.
3              AUSA YOUNG:  May I approach the witness, Your Honor?
4              THE COURT:  Yes, ma'am.
5    (BRIEF PAUSE)
6    Q    (By Ms. Carpenter) I place in front of you what's been
7    marked as Government's Exhibit One.
8    A    Yes, this is when I found out the accusations.  The --
9    Q    Hold on just a second.  Do you recognize Government's
10   Exhibit One?
11   A    Yes, I do.
12   Q    And does it fairly and accurately represent what it
13   purports to represent?
14   A    I'm sorry?
15   Q    Is it the text message you -- you sent to the victim's mom?
16   A    Yes.
17   Q    And you sent them; is that correct?
18   A    I did.
19             AUSA YOUNG:  We'd offer Government's Exhibit Number
20   One into evidence at this time.
21   (BRIEF PAUSE)
22             MS. CARPENTER:  We have no objection, Your Honor.
23             THE COURT:  There being no objection, Government's
24   Exhibit Number One will be admitted.
25   (GOVERNMENT'S EXHIBIT NUMBER ONE ADMITTED)
```

1   Q    (By Ausa Young) Now, ma'am, you stated just a moment ago

2   that these were when the allegations were made; is that correct?

3   A    Yes.

4   Q    But in your text message you start out by saying, "OMG, I

5   just talked to Michael.  I am so sorry.  I really don't know

6   what to say."

7   A    Right.  She had called me and had explained to me the

8   situation that she had been told by her daughter, and I talked

9   to him about it and he gave me his side of the story, and that's

10  when I was shocked.  So yes, I did apologize to her because we

11  were very good friends.

12  Q    And because you were such good friends, you then go on to

13  ask her for a huge favor; is that correct?

14  A    Yes, I did.

15  Q    "I have a huge favor to ask you guys.  I don't know what to

16  believe anymore.  I'm completely heartbroken, but all I can do

17  is try and protect my kids from this..."

18  A    Yes.

19  Q    "I don't know what you guys plan on doing, but I was hoping

20  you could try to find out exactly what is going on without

21  involving the police.  Please understand I'm not asking you this

22  for him..."  Do you mean Michael?

23  A    Yes.

24  Q    "...I'm just asking for my kids."

25  A    Yes.

1  Q    So it's your testimony here today that you were asking this

2  because of an allegation?

3  A    When she called me, I spoke with Michael concerning what

4  was going on.  I heard both sides of the story, didn't know what

5  to do, but my concern was my children.  My oldest son was

6  extremely good friends with the girl and --

7  Q    Were you aware that your husband had previously sent

8  messages on his work cell phone?

9  A    No.

10 Q    Were you aware that he was actually fired from his previous

11 employer for sending a text message of masturbating?

12 A    I was told that it was a picture of a naked girl.

13 Q    So you weren't aware of -- of the truth?

14 A    No, I was -- I was told that he was let go from his job

15 over a picture that was on his work phone.

16 Q    Who told you that?

17 A    Michael.

18 Q    So he didn't tell you it was a picture that he took of

19 himself masturbating?

20 A    No.

21 Q    Are you aware that the agents have since recovered that

22 picture and viewed it?

23 A    Yes.

24 Q    Are you aware that -- that Michael's admitted that's what

25 he did and that's why he got fired?

```
 1   A    Yeah, he admitted it to me afterwards.

 2   Q    When -- when did he admit it to you?

 3   A    After he was put in jail.

 4   Q    So he didn't tell you the truth about that?

 5   A    No, he didn't.

 6   Q    And were you aware that he was arrested when he was 18

 7   years old for having sex with an a 14-year-old?

 8   A    Yes, I was.

 9   Q    And that didn't concern you?

10   A    No.

11   Q    Can you explain how that doesn't concern you?

12   A    Crane's a small town.

13   Q    Is it okay to have sex with a 14-year-old when you're four

14   years older in Crane, Texas?

15   A    It's not, but the girl that said that, she -- the

16   Complainant, I guess, at the time was known for going around and

17   doing things, so...

18   Q    So it was the 14-year-old's fault that she had sex with an

19   18-year-old?

20   A    I'm not saying that, but I'm not saying that he's at fault

21   either.

22   Q    Were you aware that your husband admitted to having

23   communications with at least four other females ranging from 14

24   to 17 years of age?

25   A    I read it in the news.
```

1   Q     Did Michael tell you that?

2   A     All he told me is the only other people he had spoken to on

3   Facebook or Myspace were just friends of ours, like our nephew's

4   girlfriend, friends of my oldest son.  I didn't think anything

5   of it because he said it was just like a comment here, a comment

6   there.

7   Q     So you don't have a problem with your 28-year-old common

8   law husband talking to 14-year-old girls on Facebook?

9   A     Not really because it's a small town and we're pretty close

10  to some of our -- our son's friends.

11  Q     So it's okay to be 28 years old and talking to females that

12  are 14 years old on Facebook?

13  A     If it's a, How was cheer camp?  Hope you have a good game,

14  I don't see any problem with that.  I talk to my son's friends.

15  Q     Okay.  Were you aware that -- what you called the

16  "allegations" here your husband admitted to, to the agents?

17  A     I read it in the paper.

18  Q     Did Michael tell you?

19  A     No.

20  Q     So Michael -- he finally admitted to sending the

21  masturbation photos that got him fired, but still hasn't

22  admitted to sending these photos?

23  A     I haven't discussed it with him.  I don't ask questions

24  like that when I go visit him in jail.

25  Q     So you haven't asked him, but yet you still feel

1    comfortable with having him come and reside in your home where

2    you have children?

3    A     For my kids' case, yes.  He's a good --

4    Q     For your kids' case?

5    A     He is a good father.  They miss their dad very much.  My

6    two youngest ones are actually struggling in school because

7    their dad's not there.

8    Q     And your youngest one is how old?

9    A     Six.

10   Q     And she's a girl --

11   A     Yes, she is.

12   Q     Female; is that correct?

13   A     Uh-huh.

14   Q     And that doesn't raise any concerns with you?

15   A     Not at all.

16   Q     So knowing everything you know, knowing that your husband

17   has confessed to sending pictures of his penis to a 14-year-old

18   girl who you considered a friend, who you thought he was friends

19   with, you're not concerned?

20   A     I was actually told that the picture that y'all have

21   recovered, I guess, the video of masturbation, was sent to an

22   older lady that is my age.

23   Q     Right.  But I'm asking about the picture that your husband

24   admitted of his penis that he sent to the 14-year-old victim in

25   this case that you said y'all were friends with.

```
 1   A     Uh-huh.

 2   Q     That doesn't concern you?

 3   A     It's unnerving, I guess, but he wouldn't do anything to our

 4   children.  I trust him as a father.

 5   Q     Do you trust him with other people's children?

 6   A     Probably I would.

 7   Q     Even knowing that he's admitted to doing this?

 8   A     Uh-huh.

 9            AUSA YOUNG:  Pass the witness.

10            THE COURT:  Ms. Carpenter?

11                        REDIRECT EXAMINATION

12   BY MS. CARPENTER:

13   Q     The text messages that you sent, anywhere in those messages

14   did you threaten the mother of the victim?

15   A     Not at all.

16   Q     Was there anything in the messages that stated that

17   Mr. Cavazos was going to run if he got arrested?

18   A     Not at all.

19   Q     Was there anything that said in any way that he was a risk

20   to society?

21   A     No.

22   Q     The video that you're aware of, was that sent to a minor?

23   A     No, ma'am.

24            MS. CARPENTER:  No other questions, Your Honor.

25            AUSA YOUNG:  Nothing further, Your Honor.
```

```
 1              THE COURT:  Thank you, ma'am.  You may step down.

 2              AUSA YOUNG:  May I approach?

 3              THE COURT:  Yes.

 4              MS. CARPENTER:  I have no other witnesses.

 5              THE COURT:  You do -- or you do not?  I'm sorry, you

 6    do not.

 7              MS. CARPENTER:  I do not.

 8              THE COURT:  Okay.  I thought you said you did.

 9              COURT SECURITY OFFICER:  Do you want her to wait

10    outside?

11              THE COURT:  Yeah, please.

12                Any rebuttal of any kind?

13              AUSA YOUNG:  No rebuttal, Your Honor.  We're prepared

14    for argument.

15              THE COURT:  You're ready to argue.  Go ahead.

16              AUSA YOUNG:  I do believe -- this is argument, the

17    folks can come back in if they want to.  I mean, they --

18              THE COURT:  If you'd like them to, that's fine.  For

19    both sides, for anybody who wants to come in, they surely may.

20                Ms. Young, are you -- are you okay on time?

21              AUSA YOUNG:  No, but it'll be okay.

22    (BRIEF PAUSE)

23              THE COURT:  All right, Ms. Young, go ahead.

24              AUSA YOUNG:  Thank you, Your Honor.

25                Addressing first the matter of the preliminary
```

1    hearing in this cause, I think the testimony has been clear cut

2    that the investigation proceeded, how the investigation

3    proceeded.  It's not controverted that they had an out cry from

4    the victim's mother, that the agents then went and spoke to the

5    victim herself, a 15-year-old female, that it was -- then

6    ultimately and probably the most confirming was when it was

7    admitted to by Mr. Cavazos to two ICE investigators.  When he

8    was questioned he readily admitted, Yes, I sent a picture of my

9    penis over my cellular telephone in a text message to this

10   female who I knew to be 14 years old.

11          He admitted it.  I don't believe there's any

12   question as far as the preliminary hearing that's before the

13   Court.  I think there is more a matter of detention.

14          Pretrial Services does a great job, and I think

15   Ms. Villalba testified to what they consider, how they consider

16   in making their conversation.  The Government doesn't always

17   agree with their recommendations and this is one of those cases

18   where we just can't agree.  Specifically, I don't think that

19   there's been any testimony that -- other than Mr. Cavazos has

20   lived in Crane, Texas, it's a small town, most, if not all of

21   his life.  Certainly that doesn't weigh to being a flight risk

22   in this instance, that he has roots here, he's not been going,

23   traveling back and forth to Mexico.  But as the Court knows

24   there's other things that factor into a risk of flight.  And as

25   laid out in the Pretrial Services Report, they even list one of

1    those as the nature of the offense charged.

2                    This is a very serious offense, it's a very hurtful

3    offense to not only Mister -- to not only the victim's family

4    but Mr. Cavazos's family.  And the Government recognizes that.

5    But there is a risk of flight given just the nature of these

6    charges, as recognized as Pretrial Services.

7                    And then we move to along at the danger posed.  As

8    the Court knows, there is a presumption in this case and that

9    presumption is for detention.

10                   Specifically, Pretrial Services recommends a list of

11   things that they believe can meet and overcome that presumption.

12   And when asked by Ms. Villalba if there's any way that these

13   conditions ensure the public, the community, she said, No, they

14   don't; not at this time; we just don't have it.

15                   Not for lack of effort on their part, but there's

16   nothing with GPS monitoring that stops someone from going --

17   leaving Dismas Charities and getting a cell phone, driving by

18   Walmart, and sending another text message or another picture to

19   himself.

20                   You combine these things and you listen to the

21   statements of Mr. Cavazos.  Yes, I did what's alleged here today

22   and, Oh, yeah, by the way, I have four other 14- to 17-year-old

23   girls that I've been chatting with on Facebook, but I wasn't

24   sexting them.  And yeah, that charge back when I was 18 years

25   old and I had sex with a 14-year-old, she was climbing all over

1   me.  That wasn't my fault either.

2            The government's not saying he was ever prosecuted

3   for that charge.  Mr. Cavazos admits at 18 he had sex with a

4   14-year-old.  Mr. Cavazos admits that he sent at least one

5   picture of his penis to a known 14-year-old female.

6            There are not conditions that can fashion to protect

7   the community.  There's no way we can protect the community

8   absent detention.  GPS is a great tool on a lot of cases, Dismas

9   Charities is a great tool on a lot of cases, it's just not a

10  tool that's going to protect the community in this cause.

11           We'd ask that Mr. Cavazos be detained without bond

12  at this time.

13           THE COURT:  Thank you, Ms. Young.

14           Ms. Carpenter?

15           MS. CARPENTER:  In regards to the preliminary hearing,

16  I believe there's going to be some problem -- problems with the

17  admissibility of any statements that were given by Mr. Cavazos.

18  It was the testimony given that he was not given his Miranda

19  rights, he was not informed that he had the right to have an

20  attorney present before he was questioned about these offenses.

21  And I think that should be taken into consideration in this

22  decision today.

23           In regards to detention, Your Honor, there's no

24  proof of any pictures, any text messages by the statement of the

25  agent.  There is no criminal history of my client.  He's never

1   been convicted of any crime, he's never been prosecuted of any

2   crime.  He has family ties to the county.  As a matter of fact,

3   he's lived there his entire life.  I don't see that there's any

4   way that he would be a right -- a flight risk.  He is the sole

5   support of his family.  He was working before he was arrested,

6   he will be working again to support his family.  He will show up

7   for all his court hearings.

8           With any alleged crime, Your Honor, when you look at

9   detention for anybody -- be it bank fraud, be it drugs -- there

10  is nothing to ever cover that they will not commit another crime

11  if they're let out on bond, other than looking at their past

12  history and their criminal history and what the evidence is in

13  the case.  And I just don't think the presumption is here that

14  he be detained.  I think that Pretrial Services is correct, he

15  should be released to at least Dismas Charities with electronic

16  monitoring, if not given a bond and released to his family.

17          THE COURT:  Thank you.

18          Mr. Cavazos, if you'll stand up with your attorney

19  at the -- at the lecture, the podium there.

20          I do find probable cause exists to believe that an

21  offense has been committed and that you've committed this

22  offense, Mr. Cavazos.

23          As for the issue of detention, there is a

24  presumption against you as far as flight and -- risk of flight

25  and danger to the community.  I find the evidence to be strong.

1   I find the likelihood of conviction to be high.  And the

2   presumption on one of the two -- I believe one of the two

3   charges, which would be the coercion and enticement charge,

4   which is a ten to life, it carries a maximum penalty of

5   mandatory -- mandatory ten years to life in prison.  The

6   transferring obscene materials to minors -- to a minor, excuse

7   me, that would be, I think, zero to ten years.

8            But regardless, with that 2422(b), coercion and

9   enticement, you are looking at, if convicted -- and again, I

10   think the likelihood of conviction is strong -- a lot of time

11   that you're going to be sentenced to.

12           This has not been your trial.  You will have an

13  opportunity -- and I suspect as Ms. Carpenter has stated, you'll

14  have an opportunity for another preliminary hearing on

15  supression, likely, of statements that you've made.

16           But I do not believe I can fashion any combination

17  of conditions that will ensure the safety of the community or

18  your return.  I do believe you have significant reason to flee

19  based on the evidence and likelihood of conviction and the

20  likelihood of -- of such a large sentence that you would

21  receive.

22           I also would just note that Pretrial Services does

23  do a great job.  They do a great job all the time.  And if they

24  were telling me all the time that somebody should -- you know,

25  everybody should all stay locked up, then I'd be suspicious.

1    But what they do not and are not allowed to look at is strength

2    of case, weight of evidence.  And that's something I'm required

3    by statute to look at.

4              And I am also very disturbed by the previous

5    aggravated sexual assault charge.  You don't have a criminal

6    record for conviction, you do have a criminal record.  You have

7    been arrested obviously and you served that -- you know,

8    somebody decided that alternative school was enough.  And I

9    wasn't there, I can't judge that.  However, that in your past,

10   as well as additional contact with younger people.

11             The -- the most compelling part of your story that I

12   find difficult to deal with is the straights, the dire straights

13   you've put your family in if -- if you're guilty of this and the

14   need that your family has for you to give them income.  But I

15   don't know how we can protect everybody else's kids.

16             And so it's my ruling that you -- that the

17   presumption has not been overcome and that you should be

18   detained pending the resolution of your case.  I will tell you

19   that you have a right to appeal my ruling.

20             But I'll have a ruling in writing filed by today or

21   early in the morning, Ms. Carpenter.

22         MS. CARPENTER:  Thank you, Judge.

23         THE COURT:  Mr. Carpenter, anything further that we

24   need to discuss?

25         MS. CARPENTER:  No, Your Honor.

1          THE COURT:  Ms. Young?

2          AUSA YOUNG:  Nothing further, Your Honor.

3          THE COURT:  Thank you.  Thank you all.  I appreciate

4    everyone being here and I will see you again, Mr. Cavazos.

5          DEFENDANT CAVAZOS:  Okay.

6          THE COURT:  I'll remand you to the custody of the

7    marshals at this time.

8    (END TIME, 4:46:30 P.M.)

9                              -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3  U.S. DISTRICT COURT          )

4  WESTERN DISTRICT OF TEXAS )

5  MIDLAND/ODESSA DIVISION     )

6

7

8          I, VICKIE-LEE GARZA, Court Approved Transcriber,

9  certify that the foregoing is a correct transcript, to the best

10 of my ability, from the official electronic sound recording of

11 the proceedings in the above-entitled matter.

12          Certified to by me this 1st day of March, 2011.

13

14

15                          /s/  VICKIE-LEE GARZA
                            TX CSR# 9062, Expires 12/31/12
16                          Firm Registration No. 79

17

18

19

20

21

22

23

24

25